Cite as 2020 Ark. 150

# SUPREME COURT OF ARKANSAS
No. CV-17-924

| | |
|---|---|
| VICTOR BERNARD WILLIAMS, M.D.<br><br>APPELLANT<br><br><br>V.<br><br><br><br>BAPTIST HEALTH D/B/A BAPTIST<br>HEALTH MEDICAL CENTER ET AL.<br><br><br><br><br>APPELLEES | Opinion Delivered: April 23, 2020<br><br>APPEAL FROM THE PULASKI COUNTY<br>CIRCUIT COURT, SIXTH DIVISION<br>[NO. 60CV-14-808]<br><br>HONORABLE TIMOTHY DAVIS FOX,<br>JUDGE<br><br><br>AFFIRMED IN PART; REVERSED AND<br>REMANDED IN PART; COURT OF<br>APPEALS OPINION VACATED. |

**JOHN DAN KEMP, Chief Justice**

Appellant Victor Bernard Williams, M.D., appeals the Pulaski County Circuit

Court's dismissal of his action against appellees Baptist Health d/b/a Baptist Health

Medical Center, Doug Weeks, Tim Burson, M.D., T. Robert Moffett, M.D., Scott Marotti,

M.D., Frederick A. Meadors, M.D., Robert Casali, M.D., T. Robert Moffett, M.D., Susan

Keathley, M.D., William Everett Tucker, Jr., M.D., and Chris Cate, M.D. (collectively

"Baptist Health appellees"), and John M. Hearnsberger, M.D. For reversal, Dr. Williams

argues that the circuit court erred by denying him a jury trial on his bylaws-compliance

claim, denying his motions to compel discovery of peer-review information, finding that

Baptist Health substantially complied with its bylaws, and granting summary judgment on

several claims in favor of Baptist Health appellees and Dr. Hearnsberger. We affirm in part and reverse and remand in part.

## I. *Facts*

Dr. Williams, a cardiothoracic, vascular, and general surgeon, joined the medical staff of Baptist Health in November 2003. In early 2010, Dr. Guy Gardner, then-Chief Medical Officer for Baptist Health, reviewed several of Dr. Williams's surgery cases and reported concerns about the standard of care he had provided in some cases to Doug Weeks, then-Senior Vice President and Administrator of Baptist Health, and Dr. Tim Burson, then-Chair of the Surgery Control Committee.

On February 5, 2010, Dr. Williams met with Weeks and Dr. Burson. During that meeting, Weeks and Dr. Burson informed Dr. Williams that there would be a further investigation into his cases. They gave Dr. Williams the option to voluntarily resign from the medical staff at Baptist Health, but Dr. Williams declined to resign his position.

On March 23, 2010, Dr. Burson notified Dr. Williams by letter that the Surgery Control Committee met on March 15 and reviewed eleven cases where Dr. Williams was the operating surgeon. That Committee identified apparent or suspected deviations from standard clinical practice in five of those cases. The letter stated that the five cases would be discussed at an April meeting and Dr. Williams's attendance at the meeting was mandatory.

At an April 12, 2010 meeting of the Surgery Control Committee, Dr. Williams appeared and answered questions about the five cases. After the meeting, the Surgery Control Committee recommended the following course of action:

> After reviewing the above cases and providing an opportunity for Dr. Williams to respond to the questions posted by the Committee members, the Committee believes these cases raise significant concerns with regard to quality of care as described above. Dr. Williams was unable to address these concerns. Accordingly, the Committee recommends that a request for corrective action be made. In addition to the specific concerns outlined above, the Committee has a general concern with Dr. Williams'[s] unwillingness to acknowledge the identified issues or take responsibility.

On April 16, 2010, Dr. Burson submitted a written request to Weeks that the Credentials Committee investigate the five cases under review and take any corrective action that it deemed appropriate. That same day, Dr. Keathley, chairperson of the Credentials Committee, notified Dr. Williams by letter that the Committee had received a request for corrective action and was investigating the quality of medical care he provided in the five cases. The letter stated that the Credentials Committee would meet on April 21 to discuss the matter and that his attendance was mandatory. On each case, he was told to be prepared to discuss (1) pre-operative judgment, (2) medical decision-making, (3) technical ability, (4) ability to recognize post-operative complications, (5) lack of timely follow-up, (6) documentation, and (7) unwillingness to acknowledge identified issues and take responsibility. Finally, Dr. Williams was advised that, depending on the outcome of the interview and resulting action by the Credentials Committee, the matter could result in

3

the suspension or termination of his staff appointment and clinical privileges at Baptist Health Medical Center – Little Rock and other Baptist Health facilities.

The Credentials Committee met and interviewed Dr. Williams on April 21, 2010. In its report and recommendation, the Credentials Committee made specific findings of fact and conclusions of law. It found sufficient evidence to warrant terminating Dr. Williams's staff appointment and clinical privileges and recommended termination. It also immediately suspended Dr. Williams's clinical privileges pending further proceedings pursuant to the applicable bylaws and professional-staff rules. The same day, Weeks notified Dr. Williams of the Credentials Committee's action, sent him a copy of the report and recommendation, and informed him that he had thirty days after receipt of the letter to request a hearing. On May 25, 2010, Dr. Williams, through his attorney, notified Weeks that he was appealing the Credentials Committee's decision to the Hearing Committee and that he was seeking a hearing on the actions taken against him. Williams also asserted in the letter that he "believe[d] the decision of the Credential[s] Committee to have been racially biased and discriminatory."

On February 28, 2011, the Hearing Committee held its hearing that lasted almost six hours. The next day, the Hearing Committee issued its report and recommendation to the Baptist Health Board of Trustees affirming the Credentials Committee's recommendation that Dr. Williams's staff appointment and clinical privileges be terminated. Weeks notified Dr. Williams of the recommendation on March 2 and advised him that he had seven days after receiving the notice to request appellate review.

On March 10, Dr. Williams requested appellate review of the Hearing Committee's decision. After reviewing relevant documents, including the February 28 hearing transcript and written statements submitted by the parties, the Appellate Review Committee met and affirmed the Hearing Committee's report and recommendation. The Appellate Review Committee also made specific findings that (1) the staff bylaws had been followed; (2) the decision of the Hearing Committee was based on substantial evidence of record; and (3) the Hearing Committee's decision was reasonable in light of the hospital's duty to the public. On April 14, Weeks notified Dr. Williams by certified mail of the Appellate Review Committee's action. Weeks also advised Dr. Williams that the Board of Trustees Executive Committee, acting on behalf of the entire Board, affirmed the Appellate Review Committee's action and that Dr. Williams's appointment and clinical privileges at Baptist Health Medical Center – Little Rock were terminated, effective immediately.

Additionally, in June 2010—while Dr. Williams's administrative appeal was ongoing—Baptist Health reported the suspension of his clinical privileges to the National Practitioner Data Bank ("NPDB") and the Arkansas State Medical Board ("Medical Board"). The Medical Board voted to investigate the matter, but Dr. Williams asked it to postpone proceedings to allow him to pursue an administrative appeal with Baptist Health and to allow him to participate in an education and assessment program. The Medical Board proceeding resumed in June 2012 and it agreed that Dr. Williams could attend an assessment program in lieu of the Board's rendering a disciplinary decision. The Medical Board later determined that he did not comply with the requirements of the assessment

5

program, and it revoked his license after an April 3, 2014 hearing. Dr. Williams appealed the revocation, and his license was reinstated.

II. *Procedural History*

On April 21, 2011, Dr. Williams filed a lawsuit against Baptist Health and individual appellees Dr. Burson, Dr. Moffett, Dr. Marotti, Dr. Meadors, Dr. Casali, Dr. Keathley, Dr. Tucker, and Dr. Cate. Dr. Williams voluntarily dismissed his case on March 5, 2013. He refiled his complaint on February 25, 2014, naming Baptist Health and the same staff physicians and adding Doug Weeks, as well as the Medical Board and Dr. Hearnsberger, individually and in his official capacity as a member of the Medical Board. In his February 2014 complaint, Dr. Williams asserted the following claims: (1) a claim for temporary and permanent injunctive relief against the Medical Board; (2) a claim for violations of article 2, section 3 of the Arkansas Constitution, which guarantees the equality of all persons before the law; (3) a claim for due-process violations under article 2, section 8 of the Arkansas Constitution; (4) a claim of entitlement to redress of wrongs pursuant to article 2, section 13 of the Arkansas Constitution; (5) a claim of violations to Dr. Williams's liberty and property rights in the form of his medical license, pursuant to article 2, section 21 of the Arkansas Constitution; (6) a claim of retaliation and racial discrimination under the Arkansas Civil Rights Act of 1993 ("ACRA"); (7) a claim for tortious interference with Dr. Williams's contracts with his patients, insurance companies, and other hospitals; (8) a claim for tortious interference with Dr. Williams's contracts with referral physicians in the Pulaski County area; (9) a claim that Baptist Health appellees

violated the bylaws and professional-staff rules of Baptist Health; (10) a defamation claim; (11) an equal-protection claim under the Arkansas Constitution; (12) a claim for damages and attorney's fees; and (13) a claim of violations under article 2, section 2 of the Arkansas Constitution.

In his prayer for relief, Dr. Williams sought reinstatement of his medical-staff privileges, a stay of his Medical Board proceedings, compensatory damages in an amount exceeding $75,000, punitive damages, a jury trial, costs and attorney's fees, an order enjoining the defendants from retaliating, and an order requiring all defendants to keep accurate, reliable, and certifiable minutes at each stage of the investigation.

On August 8, 2014, Dr. Hearnsberger filed a motion for summary judgment on the individual-capacity claims against him, and the circuit court granted that motion on December 8, 2014. On November 5, 2015, the circuit court entered a consent order dismissing the Medical Board and Dr. Hearnsberger in his official capacity.

On December 23, 2014, Baptist Health appellees filed a partial motion for summary judgment on Claims 2, 3, 4, 5, 11, 12, and 13. The circuit court granted the motion and dismissed those claims. On January 9, 2015, Baptist Health appellees filed a second partial motion for summary judgment on the retaliation claim within Claim 6 and on Claim 10, and those claims were also dismissed. On December 16, 2016, Baptist Health appellees filed a third motion for summary judgment on the remaining claims against them—Claims 6, 7, 8, and 9. The circuit court granted summary judgment on Claims 6, 7, and 8, and it granted Claim 9 as to the individual Baptist Health appellees. The circuit court denied the

motion on Claim 9 only as to Baptist Health. That claim was tried in a bench trial on February 28, 2017, and the circuit court dismissed it with prejudice on April 13, 2017.

Dr. Williams appealed the dismissal of his lawsuit to the court of appeals, which affirmed the case in part and reversed and remanded it in part. *Williams v. Baptist Health*, 2019 Ark. App. 482, at 32–33, 587 S.W.3d 275, 292. Dr. Williams then filed a petition for review, which we granted. When we grant a petition for review, we treat the appeal as if it had originally been filed in this court. *Stone v. Washington Reg'l Med. Ctr.*, 2017 Ark. 90, at 4, 515 S.W.3d 104, 107.

### III. *Points on Appeal*

### A. Denial of Right to a Jury Trial

For his first point on appeal, Dr. Williams argues that the circuit court erred by removing his case from the jury-trial docket as a sanction for not forcing Baptist Health appellees into mediation. He claims that his right to a jury trial can only be lost through an intentional relinquishment of a known right, not by inaction. Baptist Health appellees respond that the only remaining claim when the case was removed from the jury docket, the bylaws-compliance claim, was subject to the doctrine of nonreview and, alternatively, that it was an equitable claim on which Dr. Williams was not entitled to a jury trial.

The Arkansas Constitution does not ensure the right to a jury trial in all possible instances, but rather in those cases where the right to a jury trial existed when the constitution was framed. *Baptist Health v. Murphy*, 2010 Ark. 358, at 13, 373 S.W.3d 269, 280. Further, the right to a jury trial extends only to those cases that were subject to trial by

jury at the common law. *Id.*, 373 S.W.3d at 280. In equitable proceedings, there was no right to a jury trial at the common law. *Id.*, 373 S.W.3d at 280. Thus, the constitutional right to a jury trial does not extend to equity. *Id.*, 373 S.W.3d at 280.

In *Brandt v. St. Vincent Infirmary*, 287 Ark. 431, 701 S.W.2d 103 (1985), we held that a private hospital has a right to set its own policies regarding medical treatment. There, we distinguished the rights of private hospitals from those of public ones, which are prohibited from acting arbitrarily and capriciously in setting policies on medical treatment by physicians under the Equal Protection and Due Process Clauses of the United States Constitution and under article 2 of the Arkansas Constitution. *Id.* at 434, 701 S.W.2d at 105; *see also Lubin v. Crittenden Hosp. Ass'n*, 295 Ark. 429, 430–31, 748 S.W.2d 663, 664 (1998) (holding that it was not necessary that Crittenden Memorial Hospital afford a staff physician due process in deciding whether to discipline him because it was a private hospital); *cf. Baptist Health v. Murphy*, 365 Ark. 115, 129–30, 226 S.W.3d 800, 812 (2006) (holding that judicial review is appropriate as to private-hospital action where there has been a finding that Arkansas law had been violated).

Here, Dr. Williams's claim—that Baptist Health violated its own professional-staff rules and bylaws—is not a constitutional one. Thus, unlike the claims in *Brandt* and *Lubin*, we hold that Dr. Williams's bylaws-compliance claim is subject to a limited judicial review. In so holding, we are guided by other jurisdictions that have recognized a limited review for alleged violations of medical-staff bylaws and have restricted the relief available to injunctive relief, not damages. *See, e.g., Hourani v. Benson Hosp.*, 122 P.3d 6, 11 (Ariz. Ct.

9

App. 2005); *Mason v. Cent. Suffolk Hosp.*, 819 N.E.2d 1029, 1030 (N.Y. 2004); *Pulido v. St. Joseph Mem. Hosp.*, 547 N.E.2d 1383, 1388 (Ill. App. Ct. 1989). We agree with these jurisdictions that only injunctive relief, an equitable remedy, is available for this type of claim.[1] Thus, we hold that the circuit court did not err in conducting a bench trial on the claim that Baptist Health violated its bylaws and professional-staff rules because the claim was an equitable one. We affirm the circuit court's decision to conduct a bench trial on the bylaws-compliance claim.

### B. Denial of Motions to Compel Discovery

Next, Dr. Williams argues that the circuit court abused its discretion by denying his motions to compel responses to two discovery requests: (1) the peer-review records of similarly situated physicians on the medical staff, and (2) the identities of physicians that complained about his treatment of patients at Baptist Health. He contends that the discovery fell within a statutory exception to the peer-review privilege asserted by Baptist Health appellees.

### 1. *Applicable law*

A circuit court has broad discretion in matters pertaining to discovery, and the exercise of that discretion will not be reversed absent an abuse of discretion that is prejudicial to the appealing party. *Hardy v. Hardy*, 2011 Ark. 82, 380 S.W.3d 354. This

---

[1]Although the Arkansas Peer Review Fairness Act is inapplicable to the proceedings in this case, our holding is consistent with Act's exclusion of civil damages from the relief available for claims similar to this one. *See* Ark. Code Ann. §§ 20-9-1312, 20-9-1313(c) & (e) (Repl. 2018); Acts of 2017, Act 975, § 6, eff. Aug. 1, 2017.

court has described abuse of discretion as a high threshold that requires not only error but also that the ruling was made improvidently, thoughtlessly, or without due consideration. *Rhodes v. Kroger Co.*, 2019 Ark. 174, 575 S.W.3d 387.

Baptist Health appellees rely on two peer-review-privilege statutes to support their argument that Dr. Williams was not entitled to the disputed discovery. We review issues of statutory construction de novo. *Farris v. Express Servs., Inc.*, 2019 Ark. 141, 572 S.W.3d 863. The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving words their ordinary and usually accepted meaning in common language. *Id.*, 572 S.W.3d 863. When the language of the statute is plain and unambiguous, there is no need to resort to the rules of statutory construction. *Id.* at 4, 572 S.W.3d at 863.

The first privilege statute, Arkansas Code Annotated section 16-46-105(a) (Supp. 2019), states,

> (1)(A) The proceedings, minutes, records, or reports of organized committees of hospital medical staffs or medical review committees of local medical societies having the responsibility for reviewing and evaluating the quality of medical or hospital care, and any records, other than those records described in subsection (c) of this section, compiled or accumulated by the administrative staff of such hospitals in connection with such review or evaluation, together with all communications or reports originating in such committees, shall not be subject to discovery pursuant to the Arkansas Rules of Civil Procedure or the Freedom of Information Act of 1967, § 25-19-101 et seq., or admissible in any legal proceeding and shall be absolutely privileged communications.

> . . . .

> (2) Neither shall testimony as to events occurring during the activities of such committees be subject to discovery pursuant to the Arkansas Rules of Civil Procedure or the Freedom of Information Act of 1967, § 25-19-101 et seq., or admissible.

11

The second privilege statute, Arkansas Code Annotated section 20-9-503(a)(1) (Repl. 2018), states that "[t]he proceedings and records of a peer review committee shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are subject to evaluation and review by the committee."

Dr. Williams relies on a statutory exception to peer-review privilege, section 16-46-105(b)(2) (Supp. 2019), which states that

> nothing in this section shall be construed to prevent discovery and admissibility if the legal action in which such data is sought is brought by a medical practitioner who has been subjected to censure or disciplinary action by such agency or committee or by a hospital medical staff or governing board.

### 2. *Analysis*

In this instance, the disputed discovery fits within the plain language of section 16-46-105(b)(2). The discovery sought was in a legal action brought by a medical practitioner, Dr. Williams, who had been subjected to disciplinary action by a hospital medical-staff or medical-review committee. The subdivision (b)(2) exception does not contain the limitation advanced by Baptist Health appellees that Dr. Williams had the right to obtain only the medical records and documents reviewed and used in his own peer-review proceedings.[2]

---

[2]The dissent asserts that the legislature's use of the word "such" in subdivision (b)(2) evinces its intent to limit the exception to a plaintiff's own medical-review data. We disagree. If the legislature intended for the exception to apply only to materials from the plaintiff's own peer-review proceedings, then it "could have so expressly provided." *Ark. State Bd. of Election Comm'rs v. Pulaski Cty. Election Comm'n*, 2014 Ark. 236, at 15, 437 S.W.3d 80, 89; *Teague v. Walnut Ridge Schs.*, 315 Ark. 424, 428, 868 S.W.2d 56, 58 (1993).

Because the exception applies to the requested discovery, we hold that the circuit court abused its discretion in denying Dr. Williams's motions to compel production of the two types of disputed discovery.

### 3. *Harmless error*

We must also determine whether the circuit court's discovery error was harmless. Baptist Health appellees contend that any discovery error was harmless because all of Dr. Williams's claims against them failed as a matter of law, and no amount of discovery would have remedied the deficiencies. We will not reverse a circuit court's discovery ruling absent a showing that additional discovery would have changed the outcome of the case. *Worden v. Kirchner*, 2013 Ark. 509, at 5, 431 S.W.3d 243, 247.

We agree with Dr. Williams that the discovery error was not harmless as to the discrimination claim within Claim 6 and Claims 7 and 8. First, in their motion for summary judgment on these claims,[3] Baptist Health appellees argued that they were entitled to statutory immunity pursuant to Arkansas Code Annotated sections 17-1-102(a)(3) and 20-9-502, both of which require an absence of malice. The discovery may

---

The legislature did not expressly include such language. Our plain reading of the statute is consistent with federal courts' refusal to bar medical peer-review evidence in discrimination cases. *See, e.g.*, *Virmani v. Novant Health, Inc.*, 259 F.3d 284, 289 (4th Cir. 2001) ("To prove his allegations of disparate treatment, [the plaintiff] must compare the proceedings in his case against those involving similarly situated physicians. The interest in facilitating the eradication of discrimination by providing perhaps the only evidence that can establish its occurrence outweighs the interest in promoting candor in the medical peer review process.").

[3]This motion also sought summary judgment on Claim 9, but summary judgment was denied on that claim, and it was tried at a bench trial.

have assisted Dr. Williams in showing malice to rebut Baptist Health appellees' assertions. Second, on the discrimination claim, Baptist Health appellees argued below that "[r]efuting claims of conspiracy to discriminate based on race would require disclosing all corrective actions which came before the Control Committee, the Credentials Committee, the Hearing Committee[,] and the Appellate Review Committee." The information needed by Baptist Health appellees to refute the discrimination claim may also have enabled Dr. Williams to withstand summary judgment on it. Third, in Claims 7 and 8, the tortious-interference claims, Baptist Health appellees asserted below that "[t]hese [Surgery Control] Committee members did not initiate the review of Dr. Williams'[s] cases." Information on the identities of physicians that complained to Dr. Gardner about Dr. Williams may have enabled him to demonstrate a genuine issue of material fact on his tortious-interference claims. *See generally Baptist Health*, 2010 Ark. 358, at 15, 373 S.W.3d at 281–82. In sum, we hold that the discovery error was not harmless as to the discrimination and tortious-interference claims, and we reverse and remand those claims for proceedings consistent with our opinion.

The discovery error was harmless, however, as to the other claims on which summary judgment was granted. First, we do not believe the evidence would have rebutted Baptist Health appellees' argument that the retaliation claim failed as a matter of law under Arkansas Code Annotated section 16-123-108(a). Second, the error was harmless as to the six constitutional claims, as those claims alleged improper conduct in the Medical Board proceedings after the adverse action taken by Baptist Health appellees, not that the State

14

was responsible for that adverse action. Third, the error was harmless as to the defamation claim because the report on which the defamation claim was based accurately reflected the adverse action against Dr. Williams. Thus, except for the discrimination and tortious-interference claims discussed above, we hold that the circuit court's error in denying Dr. Williams's motions to compel was harmless, and we affirm.

## C. Substantial Compliance with Staff Bylaws

Dr. Williams argues that the circuit court erred in analyzing his bylaws-compliance claim under a substantial-compliance standard instead of determining whether he had been treated fairly under the circumstances. He also contends that inconsistent deposition and bench-trial testimony demonstrated that a reasonable jury could have reached a different conclusion than the one reached by the circuit court on the claim.

The standard of review on appeal from a bench trial is whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Hartness v. Nuckles*, 2015 Ark. 444, 475 S.W.3d 558. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, considering all the evidence, is left with a definite and firm conviction that a mistake has been made. *Robinson v. Villines*, 2009 Ark. 632, 362 S.W.3d 870. Determinations of witness credibility are within the province of the fact-finder. *Hartness*, 2015 Ark. 444, 475 S.W.3d 558. However, a circuit court's conclusions on questions of law are reviewed de novo. *Robinson*, 2009 Ark. 632, 362 S.W.3d 870.

### 1. *Circuit court's order*

Following a bench trial on Claim 9, the circuit court entered an eleven-page order dismissing the claim with prejudice. In the order, it ruled that the legal standard is "substantial compliance, which is a very low threshold." It recounted the following Baptist Health bylaws and professional-staff rules that it found to be relevant to its ruling:

3. Section 2.1.5 of the Bylaws [ ] defines practitioner as any individual who has met the qualifications for and who has been granted staff appointment and clinical privileges in the hospital. Practitioner does not include non-physician employees and non-physician independent contractors of the hospital.

4. Section 3.1 General Qualifications: Staff appointment and clinical privileges are privileges extended by the hospital and not a right of any applicant or practitioner.

5. Section 3.1.8 Nondiscrimination: No aspect of staff appointment or particular clinical privileges shall be denied on the basis of sex, race, creed, color, or national origin.

6. Section 3.3.1 Duration of Initial Appointments: All initial staff appointments and grants of clinical privileges shall be for a period of not more than two years.

7. Section 3.3.2 Reappointments: Reappointments to any category of the staff and the renewal of clinical privileges shall also be for a period of not more than two years.

8. Article Seven of the Bylaws deals with corrective actions. Section 7.1, the purpose is stated as "to provide for action whenever there are grounds to suspect that a practitioner has engaged in, made, or exhibited acts, statements, demeanor, or personal or professional conduct, either within or outside the hospital, which is, or is reasonably like to be;" and there are a number of subpoints, but the one that is relevant here is 7.1.1, "detrimental to patients' safety or the delivery of appropriate patient care in the hospital."

9. Section 7.2 begins the section in the Bylaws on corrective action procedures. "The Professional Staff Executive Committee shall adopt rules specifying the standards criteria and procedures for corrective action."

16

10. Corrective action procedures include the following: 7.2.1, summary suspension; 7.2.2, automatic suspension; 7.2.3, corrective action; 7.2.4, temporary suspension.

11. Article 8 concerns the hearing and appellate review procedures that are set forth in the Bylaws.

12. Section 8.1 Right to Hearing and Appellate Review: Except as provided in Section 8.4, when any applicant or practitioner receives notice of any final adverse action under circumstances as defined in Sections 8.1.2 and 8.1.3, he shall be entitled upon timely and proper request to the hearing and other procedures provided for in this article.

13. The title to that subsection, even though 3.1 says general qualifications that staff appointments are privileges and not a right of any applicant, that begins quite a number of situations in which the word "right" is used subsequently in the exact same Bylaws.

14. Under 8.2 Hearing and Appellate Review Procedures, Section 8.3 deals with Actions and Practitioners' Rights. Section 8.3.1, Adverse action: The following recommendations or actions, if deemed final under Section 8.3.2 below, shall entitle the practitioner to the rights provided for in [Sections] 8.1 and 8.2. 8.3.1.3 is revocation of staff appointment, which is the one that was germane to the matter before us.

15. 8.3.2 Final Action: A recommendation or action listed in Section 8.3.1 above is final only when it has been: 8.3.2.1, recommended by the Credential[s] Committee pursuant to procedures listed in rules adopted by the Staff Executive Committee pursuant to Section 5.2 or Section 7.2.

16. Continuing still with the Bylaws. Article 11 concerns committees. 11.1 deals with the Executive Committee, the duties, and I believe the individuals. 11.2 does the same for the Credentials Committee.

17. Section 13.7 deals with minutes and states that minutes for each regular and special meeting of a committee, clinical department, or ancillary service shall be prepared and shall include a record of the attendance of members and the vote taken on each matter. The minutes shall be signed by the presiding officer. Copies of minutes of meetings shall be made available to members for approval, and unless disapproved, forwarded to the executive committee. Each committee, clinical

department, and ancillary service shall maintain a permanent file of the minutes of each meeting.

18. And the parties also brought to the Court's attention the last item under the Bylaws was 14.1.2. Malice means the dissemination of a knowing falsehood.

19. Turning to the Professional Staff Rules . . . that were promulgated pursuant to the authority granted to the Professional Staff under the Bylaws.

20. 1.4, Reapplication After an Adverse Decision Denying the Application, Adverse Corrective Action, or Resignation in Lieu of Disciplinary Action: There is to be no reapplication for a period of 36 months.

21. 1.58, Board Action: Only the Board has the power to take final action on a reapplication for staff appointment or clinical privileges. The fact that the Credentials Committee has made favorable recommendation shall not be deemed to confer staff appointment or clinical privileges past the expiration of the term of the appointment and clinical privileges.

22. Rule 7 of the Professional Staff Rules deals with corrective actions. 7.1.1 allows for corrective action in the event of impairment to patient safety or delivery of appropriate patient care.

23. 7.2 sets out the procedure for summary suspension. 7.2.1, Summary Suspension Generally: Staff credentials and Board Executive Committee have authority to issue summary suspensions. Such authority may be delegated to the Chief of Staff, chief of any department, and the CEO. In the event of a summary suspension, the Staff Credentials Committee must ratify within ten days of the suspension.

24. 7.3 deals with an automatic suspension. And the reason for that is under 7.3.2, loss or suspension of a medical license immediately results in an automatic suspension of privileges.

25. 7.4 is Revocation of Appointment and Suspension or Revocation of Clinical Privileges.

26. 7.4.1 is any officer of the staff, the chief of any department, and the chairman of any standing committee and the Chief Executive Officer may be involved in that.

27.    Appeals: 8.6.6 specifically—this is in the appeals section—speaks to the utilization of attorneys. While both the affected applicant or practitioner and the adversary representative are entitled to utilize an attorney at law to make statements, introduce evidence, examine witnesses, or otherwise serve as an advocate at the hearing, it is with the understanding that the hearings provided for in these Bylaws are for the purpose of resolving on an intra-professional basis matters bearing on professional competency.

28.    8.6.13 sets forth the burden of proof during the appeals process. And in some, it says that the adversary representative makes the initial proffer of evidence, and after that the burden shifts to the appellant in the case.

The circuit court concluded that, "[e]ven in light of the things that were done incorrectly, . . . there was substantial compliance with the Bylaws and Professional Staff Rules[.]"  It dismissed Claim 9 with prejudice.

## 2. *Substantial-compliance standard and application*

First, we must determine whether the circuit court used the correct standard to analyze the bylaws-compliance claim. Substantial compliance is the standard applied by the majority of jurisdictions conducting a limited judicial review to determine whether a decision made was in compliance with the hospital's bylaws. *See, e.g., Owens v. New Britain Gen. Hosp.*, 643 A.2d 233, 242 (Conn. 1994) (the substantial-compliance test ensures procedural fairness to the physician while preserving decisions concerning staff privileges for the expert judgment of hospital officials). Under this limited review, our only inquiry is whether the hospital complied with the procedures set out in its bylaws. *See Keskin v. Munster Med. Research Found.*, 580 N.E.2d 354, 359 (Ind. Ct. App. 1991). Courts conducting this limited review have acknowledged that "it is not the role of the courts to substitute [their] judgment for that of the hospital's governing board or to reweigh the

evidence regarding the renewal or termination of medical staff privileges." *Sternberg v. Nanticoke Mem'l Hosp., Inc.*, 62 A.3d 1212, 1220 (Del. 2013); *see also Mahmoodian v. United Hosp. Ctr., Inc.*, 404 S.E.2d 750, 756 (W. Va. 1991) (recognizing that hospital officials have superior qualifications to make such decisions). Because the substantial-compliance standard is the one used by the majority of jurisdictions conducting a limited review of a bylaws-compliance claim, we adopt the standard and affirm the circuit court's use of it.

Second, we agree with the circuit court that the actions taken by Baptist Health appellees with respect to Dr. Williams's administrative-review proceedings substantially complied with Baptist Health's bylaws and professional-staff rules. Dr. Williams's complaints about inconsistencies in deposition and trial testimony are credibility matters, on which we defer to the circuit court. *See City of Little Rock v. Alexander Apts., LLC*, 2020 Ark. 12, at 17, 592 S.W.3d 224, 235. Because we hold that Baptist Health substantially complied with its bylaws and professional-staff rules, we affirm the circuit court's dismissal of Claim 9.

### D. Summary Judgment

Lastly, Dr. Williams argues that the circuit court erred in granting summary judgment to Baptist Health appellees and Dr. Hearnsberger on various claims.

### 1. *Standard of review*

A circuit court will grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. *Stokes v. Stokes*, 2016 Ark. 182, 491 S.W.3d 113.

Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.*, 491 S.W.3d 113. On appeal, the appellate court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.*, 491 S.W.3d 113. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.*, 491 S.W.3d 113. A grant of summary judgment based on a party's immunity from suit is reviewed de novo on appeal. *Martin v. Smith*, 2019 Ark. 232, 576 S.W.3d 32.

### 2. Dr. Hearnsberger

Dr. Williams argues that the circuit court erred in granting summary judgment on the individual-capacity claims against Dr. Hearnsberger.[4] Dr. Williams spends the majority of his argument on this point alleging that federal law preempts statutory immunity asserted by the Baptist Health appellees. But he does not develop an argument challenging Dr. Hearnsberger's assertion of statutory immunity under Arkansas Code Annotated section 17-80-103 (Repl. 2010). Further, he alleges generally that Dr. Hearnsberger engaged in malicious conduct but does not explain how that allegation would defeat Dr. Hearnsberger's entitlement to judicial or statutory immunity.

---

[4]Dr. Williams's appeal challenges only the December 8, 2014 order granting summary judgment on the individual-capacity claims. The official-capacity claims against Dr. Hearnsberger were dismissed by agreement of the parties on November 5, 2015.

21

We have held that the failure to cite legal authority or develop a point legally or factually is reason enough to affirm the circuit court. *Walters v. Dobbins*, 2010 Ark. 260, at 6–7, 370 S.W.3d 209, 213. We have also recognized that a bare allegation is insufficient to demonstrate malice. *Simons v. Marshall*, 369 Ark. 447, 454, 255 S.W.3d 838, 844 (2007). Because Dr. Williams has failed to present convincing and developed arguments, we affirm the grant of summary judgment on the individual-capacity claims against Dr. Hearnsberger.

### 3. *Discrimination and retaliation claims*

Dr. Williams next asserts that the circuit court erroneously granted summary judgment on the discrimination and retaliation claims within Claim 6. Specifically, he contends that it erred as a matter of law by using an incorrect legal framework to analyze the discrimination claim, failed to make specific findings, and prematurely granted summary judgment before he had the opportunity to obtain relevant discovery of information on similarly situated physicians.

Because we reverse and remand the circuit court's grant of summary judgment on the discrimination claim based on a discovery error, we decline to address Dr. Williams's additional arguments for the reversal of summary judgment on the claim.

On the retaliation argument, Baptist Health appellees respond that summary judgment should be summarily affirmed because Dr. Williams has failed to develop his argument on appeal. His argument on this point focuses on the discrimination claim. This

court has stated that arguments unsupported by convincing argument or authority will generally not be considered on appeal. *City of Little Rock v. Nelson*, 2020 Ark. 34, at 13, 592 S.W.3d 633, 642. Here, although he references the retaliation claim and the March 6, 2015 order granting summary judgment on it, he does not make a specific argument supported by authority as to why the circuit court erred in granting summary judgment. Accordingly, we affirm the circuit court's grant of summary judgment on the retaliation claim.

### 4. *Constitutional claims*

Williams next argues that the circuit court's grant of summary judgment on his constitutional claims—Claims 2, 3, 4, 5, 11, and 13—should be reversed. He maintains that several issues of material fact existed that precluded summary judgment.

Although public hospitals are subject to suit for alleged violations of constitutional rights, private hospitals generally are not subject to the same standards as public hospitals. *Brandt*, 287 Ark. at 434, 701 S.W.2d at 105. We have held, however, that a private hospital will be considered public and subject to judicial review in two circumstances: (1) "when the relationship or nexus between the state and the institution is symbiotic in character and the state has so far insinuated itself into a position of interdependence that it must be recognized as a joint participant in the challenged activity," and (2) "when the institution is

23

dedicated to a public purpose" or "may exercise some power delegated to it by the state which is traditionally reserved exclusively to the state." *Id.*, 701 S.W.2d at 105. We have stated that the nexus between the state and the challenged action of the private hospital must be sufficiently close so that the action of the institution may be fairly treated as that of the state itself. *Id.*, 701 S.W.2d at 105. "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.*, 701 S.W.3d at 105 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original)).

Here, Baptist Health undisputedly is a private hospital. Thus, in order to obtain judicial review of his constitutional claims against Baptist Health appellees, Dr. Williams had to demonstrate either a sufficient nexus between the State of Arkansas and the adverse action taken against him by Baptist Health, that it was dedicated to a public purpose, or that it exercised its power against him in a manner traditionally reserved exclusively to the state. He failed to do so. We therefore hold that the circuit court did not err by granting summary judgment on those claims.

### 5. *Defamation claim*

Dr. Williams next argues that the circuit court erroneously granted summary judgment on his defamation claim. Although his complaint alleged several defamatory statements, he confines his argument on appeal to Baptist Health appellees' June 25, 2010 report to the NPDB. He contends that the report was not supported by competent medical expert testimony and that a genuine issue of material fact existed as to malice.

24

Here, the June 25, 2010 report to the NPDB accurately stated the action taken against Dr. Williams on April 21, 2010, and the basis for that action. Specifically, the report to the NPDB stated that Dr. Williams's clinical privileges had been suspended on April 21, 2010, based on "substandard or inadequate care." The report stated that he "exhibited poor preoperative judgment, poor medical decision-making, poor technical ability, an inability to recognize post-operative complications, lack of timely follow-up and lack of timely responsiveness to [his] patients' needs. Subject has requested a hearing per Staff Bylaws."

The report was based on the April 21, 2010 report and recommendation of the Credentials Committee, which contained the following findings of fact:

1. With regard to Case #9126-72 and #23971-70, the Credentials Committee finds that Dr. Williams exhibited poor preoperative judgment, poor medical decision-making, and poor technical ability.

2. With regard to Case #61446-76, the Credentials Committee finds that Dr. Williams exhibited poor preoperative judgment, poor medical decision-making, an inability to recognize post-operative complications, and a lack of timely follow-up.

3. With regard to Case #88755-74, the Credentials Committee finds that Dr. Williams exhibited poor preoperative judgment, poor medical decision-making, poor technical ability, and a lack of timely responsiveness to his patient's needs.

4. With regard to Case #32909-77, #37622-75, #35269-77 and #90851-76, the Credentials Committee finds that Dr. Williams exhibited poor preoperative judgment, poor medical decision-making, and poor technical ability.

5. With regard to Case #9439-55, #63748-70 and #87409-72, the Credentials Committee clears Dr. Williams of the Surgery Control Committee's concerns.

The Credentials Committee determined that sufficient evidence existed to terminate Dr. Williams's staff appointment and clinical privileges, recommended termination, and suspended his privileges pending further proceedings.

We have long held that the substantial truth of a statement is a defense to an allegation of defamation. *Pritchard v. Times Sw. Broad., Inc.*, 277 Ark. 458, 463, 642 S.W.2d 877, 879 (1982). Although Dr. Williams disagreed with the result of the administrative proceeding, the report to the NPDB accurately described the adverse action taken against him, as stated in the Credentials Committee's April 21, 2010 report and recommendation. Significantly, the report to the NPDB was mandated by federal law. *See* 42 U.S.C. §§ 11133–11134. Thus, we hold that Dr. Williams's defamation claim based on an accurate and federally mandated report failed as a matter of law, and we affirm the grant of summary judgment.

6. *Tortious-interference claims*

In his last point, Dr. Williams challenges the dismissal of his tortious-interference claims. Because we reverse and remand these two claims based on the circuit court's discovery error, we decline to address Dr. Williams's additional arguments for reversal.

Affirmed in part; reversed and remanded in part; court of appeals opinion vacated.

HART, WOOD, and WOMACK, JJ., concurring in part; dissenting in part.

**JOSEPHINE LINKER HART, Justice, concurring in part and dissenting in part.** I agree with the assessments and conclusions reached by the majority, save for one issue: the circuit court's denial of a jury-trial on Williams's medical bylaw claim. It appears

26

undisputed that the circuit court removed Williams's case from the jury trial docket after the parties failed to engage in mediation ordered by the circuit court. While mediation can be useful in some instances, a circuit court's preference that the parties attempt to resolve their differences out of court cannot defeat one's constitutional right to a jury trial. On appeal, the majority resolves this issue by simply concluding that one can only recover equitable relief on a medical bylaw claim, while jury trials are only guaranteed as to claims for legal relief—therefore, Williams, as a matter of law, was never entitled to a jury trial on his bylaw claim in the first place. I disagree; assuming a physician can factually establish that a hospital violated its by-laws, that the physician sustained damages, and importantly, that those damages were caused by the violation, then I see no reason why the physician's claim should be limited to equitable relief. Williams has to prove his claim, but the jury should decide whether it's proven. Accordingly, I dissent on this issue.

**RHONDA K. WOOD, Justice, concurring in part and dissenting in part.** I dissent from the majority opinion as to Section III. B. Denial of Motions to Compel Discovery. I think the majority misinterprets Arkansas Code Annotated section 16-46-105 and ignores the intent of the General Assembly.

Williams's motion to compel involves the interpretation of Arkansas Code Annotated section 16-46-105. This statute creates a privilege for proceedings, minutes, reports, and other communications created in medical-review committees. The language specifically provides that these "shall be absolutely privileged communications." *Id.*

27

Here, Williams sought access to credentialing and peer-review communications involving other physicians. This information is privileged under section 16-46-105. However, the statute includes a waiver of the privilege which states, "nothing in this section shall be construed to prevent discovery and admissibility if the legal action in which *such data* is sought is brought by a medical practitioner who has been subjected to censure or disciplinary action by such agency or committee or by a hospital medical staff or governing board." Ark. Code Ann. § 16-46-105(b)(2) (Supp. 2019) (emphasis added). The majority interprets this statute as providing that if a practitioner brings an action related to his own disciplinary matter, then the privilege is waived, not only for communications involving his professional-medical services at the hospital, but also for all medical-review-committee communications for that hospital, even those involving other practitioners.[1]

A precise review of the statute's language suggests that this interpretation is overbroad. The issue on appeal is what data Williams is entitled to in discovery. Yet, the majority fails to interpret this portion of the statute's language. Importantly, what does "such data" include? Does it include the data involving the communications in the practitioner's particular review or all of the hospital's privileged medical-review data? In order to resolve this inquiry, we must employ the rules of statutory construction. When the language is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. *Dachs v. Hendrix*, 2009 Ark. 542, 354 S.W.3d 95. In

---

[1]It is irrelevant that Williams only sought similarly situated physician's medical-review communications in this case, because the majority's holding does not contain that limit. That limit is a relevance issue.

reviewing the language, we give words their ordinary and usually accepted meaning in common language. *Pritchett v. City of Hot Springs*, 2017 Ark. 95, 514 S.W.3d 447.

The General Assembly selected the word "such" to define the privileged data which was waived under subdivision (b)(2). *Black's Law Dictionary* defines "such" as "of this or that kind." *Black's Law Dictionary* 1661 (10th ed. 2014). Notably, the General Assembly did not use the phrase "all data." "All" means "collectively and individually." *Blacks Law's Dictionary* 93 (11th ed. 2019). Substituting the definitions showcases the distinction.

> "nothing in this section shall be construed to prevent discovery and admissibility if the legal action in which ***such [this] data*** is sought is brought by a medical practitioner who has been subjected to censure or disciplinary action by such agency or committee or by a hospital medical staff or governing board."

Compared to

> "nothing in this section shall be construed to prevent discovery and admissibility if the legal action in which ***such all [collective] data*** is sought is brought by a medical practitioner who has been subjected to censure or disciplinary action by such agency or committee or by a hospital medical staff or governing board."

Giving the word "such" its ordinary meaning, the statute provides that the practitioner is entitled to his medical-review data, not all medical-review data.

Additionally, "a basic rule of statutory construction is to give effect to the intent of the legislature." *Steve's Auto Ctr. of Conway, Inc. v. Ark. State Police*, 2020 Ark. 58, at 5, 592 S.W.3d 695, 699. Logically, the General Assembly intended for the privilege to be waived only in limited circumstances when the practitioner would need access to his or her own medical-review data. The intent was not to allow broader access. Arkansas Code Annotated section 20-9-503(a)(1) (Repl. 2018) provides that "[t]he proceedings and records of a peer

review committee shall not be subject to discovery or introduction into evidence in any civil action *against a provider* of professional health services arising out of the matters which are subject to evaluation and review by the committee." (Emphasis added.) Baptist Health and the other defendant practitioners are health-care *providers*. Williams's suit is "arising out of the matters which are subject to evaluation and review by the committee." And but for the actions taken by the committee, Williams would not have filed this lawsuit. Thus, applying the circumstances here to section 20-9-503(a)(1), the General Assembly intended that section 16-46-105(b)(2) waive the privilege only to "such data" that was the subject of the practitioner's own review.[2] The intent was not to allow others to use medical-review communications as a sword against health-care providers, like the appellants.

Lastly, I must emphasize the public policy reasons behind the hospital's medical-review-committee privilege. For the safety of patients, it is vital that hospitals have a confidential means of evaluating and reviewing practitioners and undesired outcomes in patient care. This ensures that (1) only competent practitioners continue practicing; (2) hospitals and practitioners learn from these undesired medical outcomes and evaluate current protocols and alter them if necessary to prevent undesired outcomes from

---

[2]The majority defends its interpretation in a footnote by stating it is consistent with federal decisions. However, its explanation is like comparing apples to oranges. First, federal courts have declined to create a common law peer-review privilege in the context of discrimination actions because Congress "created an express exception to the immunity provision in the case of civil rights actions." *Virmani v. Novant Health Inc.*, 259 F.3d 284, 291 (4th Cir. 2001). Moreover, Arkansas, like other states, has passed peer-review specific legislation. The issue here involves our interpretation of the Arkansas statute, not federal law, and the impact of the majority's interpretation extends beyond discrimination cases.

reoccurring; and (3) hospitals have committees that can work confidentially with practitioners who are struggling with substance abuse, mental health, skills, and other issues. Ensuring that these communications are absolutely privileged absent narrow exceptions allows an open dialogue within a hospital for the protection of patients. As a policy matter, Arkansas needs our health-care system to thrive by supporting an environment where there can be confidential reporting of any concerns regarding practitioners or suggestions on improving patient care. Undoubtedly, practitioners should have access to information on their own cases as the General Assembly provided for by statute. However, the majority's broad interpretation of the waiver gives practitioners a means to access other practitioners' medical-review communications. Because this strips the assurance of confidentiality in medical-review communications, reporting and cooperating will be stifled within hospitals in the future to the detriment of health care in Arkansas. Hesitancy to report practitioners or to suggest improvements, for fear it will suggest negligence for past behavior, will undoubtably occur when the confidential medical-review system is undermined. For these reasons, I dissent.

WOMACK, J., joins.

*Andre K. Valley*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Byron Freeland* and *Megan D. Hargraves*, for appellee Baptist Health.

*Anderson, Murphy & Hopkins, L.L.P.*, by: *Jason J. Campbell*, for separate appellee John E. Hearnsberger, M.D.