Cite as 2024 Ark. App. 414

# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV-22-125

| | |
|---|---|
| JADE PROPERTY HOLDINGS, LLC; JONATHAN J. DUNKLEY; JACQUELYN CASTAING DUNKLEY; AND BELLATORI, LLC<br><br>APPELLANTS<br><br>V.<br><br>FIRST SERVICE BANK<br><br>APPELLEE | Opinion Delivered September 11, 2024<br><br>APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73CV-20-384]<br><br>HONORABLE DANIEL C. BROCK, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

This case is about a dispute between borrowers and their lending bank. The appellants borrowed more than $2 million to purchase and repair an apartment complex, much of which was not repaid. The circuit court granted summary judgment for foreclosure in favor of the bank and dismissed the borrowers' counterclaims. The borrowers appealed the circuit court's order.

We affirm the circuit court's order.

## I. *Factual Background*

In 2018, Jacquelyn and Jonathan Dunkley retired from their jobs to become real estate investors. They decided to purchase a sixty-two-unit apartment complex across from Harding University that they estimated would cost more than $870,000 to renovate. The

Dunkleys then formed Jade Property Holdings, LLC ("Jade"), to act as the property owner; and Bellatori, LLC ("Bellatori"), to hold their retirement funds. The Dunkleys, Jade, and Bellatori are the appellants.

Throughout 2018, the Dunkleys met with Matt Carter, a loan officer with First Service Bank ("FSB"), to discuss various aspects of the potential investment, including financing. On August 16, Jade executed a contract to purchase the property for $1.1 million. On October 5, the appellants closed on the loan to finance the project. The loan documents consist of the following: (1) a commercial construction loan agreement and business loan agreement (together, the "Loan Agreement"); (2) a commercial promissory note with a principal of $1,128,203 (the "6587 Note"); (3) a commercial promissory note with a principal of $150,000 (the "6617 Note"); (4) a commercial promissory note with a principal of $850,000 (the "6618 Note"); (5) a commercial construction real estate mortgage granting FSB a first mortgage lien on the property; and (6) an unlimited continuing guaranty executed by the Dunkleys and Bellatori guaranteeing all three promissory notes. The 6587 Note was used to provide the purchase money for the property. The 6617 Note and the 6618 Note were used to provide a line of credit for the repairs to the property.

All the promissory notes had maturity dates of October 15, 2019, which was written prominently on the first page of each note. The Loan Agreement stated, "Lender may stop making Advances for Work and performing any other obligations under the Loan Documents." It also stated, "Lender shall not be required to make any Advance until the Draw Request is approved by its representatives." The 6617 and 6618 Notes also contained

the following provision: "Advances by Lender under this Note are discretionary and the Lender may, in its sole discretion, refuse to make advances."

After closing on the property and the loan, the Dunkleys took possession and began renovations. They took advances as planned and without incident from the loan between October 5 and February 2019. Both the 6617 Note and the 6618 Note listed the loan purpose as "remodel apartment complex." FSB noticed in January 2019 that although 75 percent of the loan proceeds had been advanced, only 45 percent of the project had been completed, and FSB believed the Dunkleys had used some of the money for personal expenses. The appellants claimed in their depositions that they told Carter they would be using some of the loan for personal expenses.

On February 15, FSB froze the loan account, causing some contractors' payments to bounce. By this point, FSB had made $709,266.38 in advances. Although FSB paid the bounced checks, it did not advance any further funds until after the appellants had signed a supplemental loan agreement.

On July 15, the appellants signed the supplemental agreement (the "Supplemental Agreement"), which modified the promissory notes to extend the maturity dates and added an additional $75,000 in available funds to the 6618 Note. The Supplemental Agreement also reduced the interest rates on the promissory notes from 5.95 percent to 5.5 percent and 4.5 percent. The Supplemental Agreement also contained a release of claims that the appellants had or may have against FSB. Jade took additional draws from the line of credit after signing the Supplemental Agreement.

Jade defaulted on the loan by failing to make payments starting in March 2020. The 6617 and 6618 Notes each matured on April 15, 2020, and the 6587 Note matured on May 15, 2020. Neither the Dunkleys nor Bellatori made payments on the promissory notes. Additionally, the insurance coverage on the property lapsed in April of 2020, even though the Loan Agreement required the appellants to insure the property. At this point, FSB purchased insurance for the project.

As of July 24, 2020, Jade owed $1,137,610.21 on the 6587 Note. FSB held a $150,000 CD as collateral, which it used to pay the outstanding balance on the 6617 Note and applied the remaining amount to the 6618 Note. As of July 24, 2020, the Dunkleys and Bellatori owed $886,056.92 on the 6618 Note.

FSB filed a complaint against the appellants for breach of contract and foreclosure. The appellants then filed a counterclaim against FSB alleging negligence, breach of contract, intentional interference with business expectancy, intentional interference with contractual relations, deceptive trade practices, unjust enrichment, violation of the CARES Act, fraud, misrepresentation, and deceit. The counterclaim asked for a declaratory judgment, injunctive relief, and punitive damages.

FSB moved for summary judgment on its claims and against the appellants' counterclaims. The circuit court granted FSB's motion for summary judgment. The appellants appealed the summary-judgment order.

## II. *Standard of Review*

The standard of review for summary-judgment appeals is well settled. This court first considers whether the moving party established a prima facie showing of entitlement to summary judgment. *Manley v. Zigras*, 2024 Ark. App. 168, at 3, 686 S.W.3d 561, 565. The moving party bears the burden of showing that no material questions of fact remain. *Id.* at 4, 686 S.W.3d at 565. The moving party's proof is to be viewed in the light most favorable to the party opposing the motion, and any doubts are resolved against the moving party. *Id.* If the moving party establishes its prima facie case, then the "the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact." *Id.* at 5, 686 S.W.3d at 566. In meeting proof with proof, "speculation and conjecture are not sufficiently definite or precise to prove a genuine issue of material fact." *Id.* at 6, 686 S.W.3d at 566.

"Summary judgment is no longer viewed by this court as a drastic remedy; rather, it is viewed simply as one of the tools in a circuit court's efficiency arsenal." *Reggans v. Schlesinger*, 2024 Ark. App. 227, at 8, 687 S.W.3d 387, 393. When it is clear there are no genuine issues of material fact to be litigated, the moving party is entitled to judgment as a matter of law, and this court will affirm. *Id.*

III. *Analysis*

A. Breach of Contract and Foreclosure

The appellants make four arguments asserting why they believe the circuit court erred in granting summary judgment on FSB's foreclosure and breach-of-contract claims. We address each argument separately.

1. *Whether FSB committed the first material breach that prevented performance*

5

The appellants argue their breach was excusable because FSB committed the first material breach of the Loan Agreement and prevented their performance under the contract. The first material breach, they argue, was FSB's freezing the loan in February 2019. The appellants argue that because the account was frozen, they were unable to finish the project and find tenants to rent the units.

The appellants have not met proof with proof to establish a material issue of fact. Although their argument is that the February 2019 freeze prevented them from finishing the project, the account records show that the appellants took additional draws after June 2019 and were able to continue making payments through March 2020. There is no evidence that the freeze made it impossible for the appellants to finish the project. Although the freeze did cause some bounced checks, FSB paid those checks. It is undisputed that work continued after the freeze had been lifted, and that was the breach appellants cited as relevant in their arguments before the circuit court.

The freeze was lifted after the appellants signed the Supplemental Agreement, and the appellants claim that FSB started requesting lien waivers from contractors after that time. Although the appellants say in their briefs that the requirement for lien waivers made it "difficult and basically impossible" to hire contractors, they do not present any evidence they were unable to hire contractors. Many of the draws after June 2019 are substantial. The only evidence appellants cite that they were unable to hire contractors even after June 2019 is Jonathan's testimony at his deposition that, after June 2019, FSB asked for items such as lien wavers that one attorney told him were impossible for anyone to complete. First, this

testimony is about what FSB allegedly asked for, and nowhere does Jonathan say that he was unable to hire contractors. Additionally, Jonathan is repeating hearsay from an attorney who was not involved in the case. Hearsay that is not admissible at trial does not establish a material fact in analyzing a summary-judgment motion. *Am. Gamebird Rsch. Educ. & Dev. Found., Inc. v. Burton*, 2017 Ark. App. 297, at 5, 521 S.W.3d 176, 178. Finally, the requirement for lien waivers was not a breach of the contract because both the Loan Agreement and the Supplemental Agreement gave FSB the option to require lien waivers.

The appellants have not shown how the breach affected their ability to finish the project, and we also note that the Loan Agreement, the promissory notes, and the Supplemental Agreement give FSB sole discretion in deciding whether to make advances. Although the appellants assert that FSB wanted to cause a default in order to foreclose on a valuable property that had already been improved, they do not cite any evidence to that effect. Unsupported conclusory statements are not disputed material facts that could overcome a movant's prima facie entitlement to summary judgment. *See Manley*, 2024 Ark. App. 168, at 6, 686 S.W.3d at 566.

The appellants have shown no disputed material facts that would show FSB breached the agreement, much less committed a material breach that hindered their ability to complete the project.

### 2. *Whether the supplemental agreement was void*

The appellants further argue that the Supplemental Agreement was void because it was procured through duress and because it was unconscionable for the same reason as the

7

original Loan Agreement. As we note in the next section, the unconscionability argument was not preserved.

As to duress, the appellants do not establish a disputed material fact that would show they were under duress when they entered into the Supplemental Agreement. To establish that a contract should be void due to duress, the appellant must show that "he or she involuntarily accepted the terms of the opposing party, that the circumstances permitted no other alternative, and that the circumstances resulted from coercive acts by the opposing party." *Levitt v. Today's Bank*, 2022 Ark. App. 343, at 9, 653 S.W.3d 501, 507. Indeed, the appellants "must show that the duress resulted from the other party's wrongful and oppressive conduct and not by his own necessity. In addition, he must show that the wrongful conduct deprived him of his own free will and volition." *Id.* at 9–10, 653 S.W.3d at 507. It is not enough to show reluctance or the possibility of financial embarrassment. *Id.*

The appellants contend they were reluctant to accept the Supplemental Agreement and that refusing to accept it would have led to foreclosure. This would constitute financial embarrassment that does not rise to the level of a threat of a grievous wrong, great bodily injury, or unlawful imprisonment. In *Levitt*, this court held that the jury could have found duress in a circumstance where the bank threatened to report the borrowers to criminal authorities and to foreclose on the borrowers' home. That is not what happened here. Even if FSB did state that it would foreclose on the Loan Agreement, FSB had the ability to do that under the contracts between the parties. It was not threatening any penalty or grievous circumstance that the parties had not already agreed to.

3. *Whether the contract was unconscionable and procured through undue influence*

The appellants also argue that the Loan Agreement was unenforceable because it was unconscionable and because FSB committed undue influence. The argument was not preserved below, so we do not address it on the merits.

"Conclusory assertions and general statements do not rise to the level of developed argument that preserves an issue for appellate review." *Petit Jean Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 2022 Ark. App. 215, at 29, 646 S.W.3d 123, 141 (citing *Nat'l Bank of Com. v. Quirk*, 323 Ark. 769, 782, 918 S.W.2d 138, 145 (1996)).

In their response to the summary-judgment motion, the appellants state,

> [Appellants] request this Court declare, for reasons alluded to herein, all claims of First Service are barred by the doctrine of unclean hands and that this Court declare the contracts between First Service and [appellants] which forms part of the subject matter of this lawsuit as void ab initio as unconscionable and against the public interest. First Service exerted and acted to cause duress, has unclean hands, exerted undue influence and committed unconscionable acts in inducing [appellants] into the loans or any modification of the loans that are the subject of this action.

This is a conclusory statement that the Loan Agreement was void because it was unconscionable and procured through undue influence, which does not rise to the level of a developed argument that is preserved for review. The appellants also did not develop an argument at any hearing that the Loan Agreements were unconscionable or the product of undue influence.

This is similar to an argument the supreme court analyzed in *National Bank of Commerce*, 323 Ark. 769, 918 S.W.2d 138. In that case, one party stated at a hearing, "I think

this whole statute is unconstitutional." *Id.* at 780, 918 S.W.2d at 144. That party used the same conclusory statement in several pleadings. *Id.* at 780–81, 918 S.W.2d at 144–45. The supreme court held that such statements were not sufficient to preserve an issue for appeal. *Id.* at 782, 918 S.W.2d at 145.

Similarly, here the appellants did not develop the arguments below, and they are now procedurally barred.

## B. Appellants' Counterclaim

The appellants filed a counterclaim against FSB for negligence, breach of contract, intentional interference with business expectancy, intentional interference with contractual relations, deceptive trade practices, unjust enrichment, violation of the CARES Act, fraud, misrepresentation, and deceit. The counterclaim asked for a declaratory judgment, injunctive relief, and punitive damages. In their brief before this court, the appellants do not make any arguments regarding negligence, deceptive trade practices, unjust enrichment, violation of the CARES Act, declaratory judgment, or injunctive relief. Therefore, this court need not address those counterclaims.

The appellants argue in their briefs that FSB committed the first breach, which would equally apply to the appeal of the dismissal of their counterclaim for breach of contract. As stated above, we affirm the circuit court's order on that point.

As for the other claims in appellants' briefs, appellants list the elements of the counterclaim and then merely state that a reasonable jury could determine FSB was liable for the cause of action "by the facts stated above[.]" For intentional interference with

contractual relations and punitive damages, the appellants do not even list elements and instead present one or two conclusory sentences that a jury should decide the claim.

This court "will not consider arguments not supported by convincing argument or citation to authority." *Sanders v. JLP, LLC*, 2024 Ark. App. 65, at 6, 683 S.W.3d 607, 611. This court also will not make appellants' arguments for them. *Id.* "[T]he failure to cite legal authority or develop a point legally or factually is sufficient to affirm the trial court's order." *Id.* (citing *Williams v. Baptist Health*, 2020 Ark. 150, 598 S.W.3d 487). Further, as to punitive damages, a bare allegation is not sufficient to demonstrate malice. *Williams*, 2020 Ark. 150, at 20, 598 S.W.3d at 501.

In their reply brief, the appellants cite some facts regarding the intentional-interference claims. However, those facts are insufficient to develop the point on appeal, and even if the facts did give rise to the intentional-interference claims, this court does not consider arguments made for the first time in a reply brief. *Sanders v. Passmore*, 2016 Ark. App. 370, at 6, 499 S.W.3d 237, 242.

For these reasons, we affirm the circuit court's order granting summary judgment in favor of FSB and dismissing the appellants' counterclaims.

Affirmed.

KLAPPENBACH and GRUBER, JJ., agree.

*Worlow Law*, by: *Jacob Worlow*, for appellants.

*The Jiles Firm, P.A.*, by: *Gary D. Jiles* and *Matthew K. Brown*, for appellee.

11