Cite as 2025 Ark. App. 311

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-21-133

|  |  |
|---|---|
| MONTIE HOBSON<br><br>APPELLANT<br><br>V.<br><br>GEORGE W. HOBSON<br><br>APPELLEE | Opinion Delivered May 14, 2025<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-15-48]<br><br>HONORABLE DOUG SCHRANTZ, JUDGE<br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Montie Hobson appeals from an order of the Benton County Circuit Court denying her postdecree claims relating to a mediated property-settlement agreement.[1] For reversal, she argues that the circuit court erred (1) in denying her claim for breach of contract; (2) in finding that the mediation agreement does not include appellee's 401(k) savings plan; (3) in finding that there was no fraud on the court; (4) in awarding appellee's

---

[1]Appellant Montie Hobson is an Arkansas attorney representing herself in this appeal. In the proceedings below, she was represented by counsel at times and self-represented at other times. Appellee George Hobson did not file a responsive brief in this appeal.

attorney's fees and not hers; (5) in excluding certain testimony and documentary evidence; and (6) in denying her motion to deem admitted certain requests for admission. We affirm.[2]

Montie and her ex-husband, George Hobson, were married on August 11, 1988. They were divorced by decree filed of record on September 17, 2015. In anticipation of divorce, they elected to participate in confidential mediation, each represented by separate counsel, and came to a mutually acceptable agreement regarding, inter alia, the division of marital assets and debts. The mediated property-settlement agreement, which is memorialized in writing in the parties' August 28, 2015 "Memorandum of Understanding" (MOU), provides, in pertinent part, as follows:

> 5. The parties agree that George will receive the marital residence subject to the debt thereon and will pay Montie the sum of $20,000 within 60 days of the entry of the Decree of Divorce. Montie will execute a Quit Claim Deed to George upon payment of the $20,000.00 and refinance of the indebtedness of the house. George agrees to refinance the indebtedness on the house and hold Montie harmless from any liability owed thereon within 60 days of the Divorce.
>
> 6. The parties agree to meet together to divide their personal property within 30 days. Montie agrees to move out of the marital residence within 60 days of the parties dividing their personal property.
>
> . . . .

---

[2]This is the third time that this case has been before us. The first time, we dismissed Montie's appeal for lack of a final order. *See Hobson v. Hobson*, 2018 Ark. App. 483 (*Hobson I*). The second time, we ordered rebriefing due to deficiencies in Montie's abstract and brief. *See Hobson v. Hobson*, 2023 Ark. App. 482 (*Hobson II*). Montie has now filed a substituted abstract, brief, and addendum curing the deficiencies.

9. Montie will receive ownership of her retirement accounts. George will receive ownership of his Entergy retirement annuity. Montie will receive 53% of gross amount of the AEP retirement account valued as of the date of divorce.

The circuit court approved the settlement and incorporated the parties' mediation agreement into the September 17 decree as follows:

8. That the parties' property and debts shall be divided as set out particularly in the parties' Memorandum of Understanding entered into in connection with mediation which has been filed herein, and same is hereby incorporated herein just as if it had been set out herein word for word. In the event the parties are unable to equally divide their personal property as provided in the parties' Memorandum of Understanding entered into in connection with mediation either party may petition the court to divide or order sold and divided equally the proceeds from any personal property upon which the parties are unable to agree.

After the decree was entered, George petitioned for modification of custody.[3]  On November 28, 2016, Montie counterclaimed for breach of contract and contempt, alleging that George did not refinance the indebtedness on the marital home until April 15, 2016—roughly five months beyond the sixty-day period set out in paragraph 5 of the MOU.  As for damages, she alleged that George's breach caused a delay in her plans to purchase a home, resulting in her paying additional monthly rent and premiums for life insurance on George to protect her financial interests as a mortgage obligor in the event of his death.  George filed an answer on December 2, 2016, generally denying the material allegations of the counterclaim.  Montie filed an amended counterclaim on May 26, 2017, incorporating the

---

[3]George later voluntarily dismissed his petition.

allegations in the original counterclaim and adding a claim that George "breached the parties' agreement by not transferring 53% of the gross amount of his AEP retirement to [her] at the time of the divorce." In his answer to the amended counterclaim, George admitted that no transfer of ownership interest in his AEP retirement account had been made to Montie but denied "that it was his duty to prepare the Qualified Domestic Relations Order to effectuate such transfer."[4]

A hearing took place on July 13, 2017. Regarding division of the marital home, George acknowledged that the parties had agreed that he was "to pay Montie $20,000 representing her part of the equity" and to get the mortgage refinanced in his name only within sixty days after entry of the divorce decree.[5] He said, and Montie agreed, that he made the $20,000 payment to Montie within the sixty-day period. He testified that he took steps toward refinancing even before the decree was entered, but he encountered issues because of the amount of debt the parties still owed, having taken out multiple mortgages on the home. After the decree was entered, on October 8, 2015, he applied for a refinance loan with Arvest Bank, but his application was denied because the home's appraisal value

---

[4]A Qualified Domestic Relations Order (QDRO) is an order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant's retirement plan[.]" Ark. Code Ann. § 9-18-101(A) (Repl. 2020).

[5]According to George, the $20,000 payment was intended as "[f]ifty percent of the equity" but ended up "being 100 percent." He explained that at the time of mediation, the parties believed they had more equity in the home than they had.

4

was not high enough. He explained that the house needed a lot of work, including repair of a leaking roof. After talking with the appraiser and a loan officer, he decided to borrow $34,000 against his 401(k) savings plan to either (1) pay down the mortgage debt and be left with a leaking roof and other home repairs, or (2) put into renovations and repairs to raise the home's appraisal value. He chose the latter option. He said that he borrowed the money in November 2015 and started work on the house immediately thereafter. He explained that the bank had preapproved his second loan application, submitted on February 5, 2016, provided that the home's appraisal value was high enough after the renovations and repairs. He said that as soon as the work was completed, the bank had the house reappraised and thereafter approved and funded a refinance loan on April 15, 2016. Montie quitclaimed her interest in the marital home to George that same day.

Montie testified that she was aware of George's efforts to refinance the indebtedness on the marital home. She said that she had been in direct contact with the bank until mid-October 2015. She testified that she was unable to purchase a home until George renegotiated the loans on the marital home to remove her as an obligor. The parties signed the mediation agreement on August 28, 2015, and she stated, "I went to my realtor, and we spent the rest of that day online looking at houses for me." According to Montie, she found the "perfect house," which was listed both for lease and for sale, so she went ahead and signed a one-year lease for $2,300 a month and moved in on September 2, 2015. She said that she talked to the realtor to make sure no one could buy the house while she was leasing it and that she could make an offer to buy it as soon as she was able to. She maintained that

5

she never intended to pay rent for a year. She explained that she had intended to buy the rental home as soon as she was removed as a mortgage obligor on the marital home—at the latest, by the end of the sixty-day period on November 17, 2015.[6] She testified that after George completed the refinance on April 15, 2016, she began negotiating the purchase of the rental house. She signed a purchase contract on May 2, 2016, and closed on June 30.

At the hearing, Montie presented a calculation of "mortgage damages" purportedly representing the money (a total of $10,076.48) that she had lost from being unable to buy the rental house on November 17, 2015. Her calculation was based on the terms of the mortgage loan she ultimately took out to purchase the house on June 30, 2016: $292,000 at 3.65 percent interest. According to Montie, if she had been able to get a mortgage loan in the same amount, and at the same interest rate, to buy the house on November 17, 2015, then by June 30, 2016, she would have paid down the $292,000 mortgage balance by $10,076.48.[7] Additionally, she testified that George's delayed refinancing forced her to continue carrying life insurance on him to protect her financial interests as a mortgage

---

[6]In contrast, George introduced a January 31, 2016 email in which Montie had asked him to let her know as soon as possible if he would be able to get the house refinanced, explaining, "I would like to start looking at houses so that I can move this summer. If you are not able to get it financed, then I would like to discuss me taking possession of the house as a possible option to sell it on the open market or live in it until you can get it financed, instead of it having to be sold at auction." Less than a week earlier, Montie had filed a contempt petition alleging George's failure to refinance by November 17, 2015, in which she requested, among other things, an order directing the sale of the marital home. She later voluntarily dismissed her petition.

[7]Montie's calculation accounted for several factors, including POA fees, homeowner's insurance, real property taxes, and tax savings.

6

obligor in the event of his death. She said that she paid a total of $1,193 in life insurance premiums during the period from November 17, 2015, to April 15, 2016.

Regarding the division of retirement assets, George testified that at the time of the mediation agreement, he was employed at American Electric Power Company (AEP) and participated in two AEP-sponsored retirement plans—a 401(k) savings plan and a pension plan. He said that these plans' benefits were held in separate accounts with separate balances. As best he could remember, at the time of the divorce, the account holding his pension benefits had a balance of approximately $76,000, and his 401(k) savings account had a balance of approximately $99,000. He testified that the parties' mediation negotiations were subject to a confidentiality agreement[8] but confirmed that the allocation of marital assets and debt they settled upon involved some "give-and-take." He acknowledged that they had agreed that Montie would receive 100 percent ownership of all her retirement accounts[9] and that he would receive 100 percent ownership of his Entergy retirement annuity.[10] He said that they also agreed to divide "the AEP retirement account," with a 53 percent share going to Montie, and the remaining 47 percent share going to him. He believed that the intention

---

[8]The parties' confidentiality agreement was admitted into evidence at the hearing.

[9]While the parties' MOU does not identify by name any of Montie's retirement accounts, in his testimony, George referred to Montie's receiving "ownership of her UTMG, her Cooper, her Walmart and all that."

[10]George testified that he previously worked for Entergy before becoming employed at AEP.

when they executed the mediation agreement was to divide his AEP pension benefits, and not his 401(k) savings. He noted that the plain language of the MOU provides for the division of a singular AEP retirement account and does not, in any provision, address his 401(k) savings account. He explained, "I've always known as a layperson that a pension is a retirement account. A 401 savings is something that you participate in voluntarily. The company puts into the pension. That is retirement. I do not have to put into the 401(k). That is a savings account." Additionally, he noted, as an example of the parties' "give-and-take," that he assumed significant tax liability and other marital debt.

Montie, in her testimony, agreed that the intention was that she would keep all her retirement accounts,[11] George would keep his Entergy retirement annuity, and they would divide "the AEP retirement account" 53/47. She disagreed, however, that the intention was to divide George's AEP pension and not his 401(k) savings. She maintained that when they executed their mediated property-settlement agreement in August 2015, she only knew about George's AEP-sponsored 401(k) savings plan; she did not know that he also participated in a separate AEP-sponsored pension plan. She conceded, however, that she did not complete discovery to determine the nature of George's retirement benefits or any specific numbers relating to retirement assets before entering into the mediation agreement. According to Montie, she first learned that there were two separate AEP-sponsored plans not long before the July 13, 2017 hearing, when, in response to interrogatories for "the balance in each of

---

[11]Montie characterized her accounts as "401(k), pension, whatever they were."

8

your retirement accounts on November 17, 2015" and "the balance in each of your 401(k) plans on November 17, 2015," George stated, "AEP Retirement account had $76,096.26," and the 401(k) plan had a balance of $99,272.48.

At the conclusion of the hearing, the circuit court ruled from the bench as follows:

Thank you. I suppose anytime that a person is directed to take certain action in regard to completing . . . an agreement that they're to make their very best good-faith efforts to accomplish that. Sometimes in the course of divorce and settlement, some assumptions may be made, as often there are, that are based on inadequate information.

[George] believed, I think, that when he made the initial inquiry with the bank, even though he may have been told that it all is dependent upon the appraisal, that he would be able to achieve the refinance of the home and thus relieve [Montie] of any further obligation on the mortgage. Obviously, that did not occur, and there was a following string of actions by [George] to accomplish that.

Now, he first made application for the refinance and it was denied because the appraisal did not meet the amount necessary . . . to release [Montie]. So at that point in time, he had the choice. He had the devil's choice [Montie] wanted him to make, and that was to use what money he could borrow against retirement or to sell vehicles or other property to get her off of the mortgage but still have the leaking roof and other damage to the house that needed to be repaired; or he could make the reasonable business decision to take that same money, effect repairs, and . . . thus take the risk that it would get to the appraised amount necessary to get her relieved from the mortgage obligation. I think that's reasonable. I can't find him in contempt for that. The devil's choice is not an appropriate one, and it is unreasonable.

Now, as to the retirement accounts, I guess it could be argued that there was not a meeting of the minds of the parties because [Montie] thought there was a single retirement account. Later we learn there are two retirement accounts. [George] could have said that very easily, since he appears to have been aware of that at the time, and it could have been included in here and absolutely clear. That didn't happen.

9

We're now two years past this agreement or almost two years past it, and the parties are asking me to interpret the agreement. All I can conclude is the retirement account is the retirement account, and the one that is labeled *retirement account* is the one she gets 53 percent of. The other is the savings account, and that does not connote retirement. So I find that she gets 53 percent of the retirement account, and . . . I believe that's the 70-something thousand dollar account, and that is the Court's decision.

On August 3, 2017, the circuit court entered a written order finding, in relevant part, as follows:

2. The Court finds that [George] is not in contempt.

3. The Court finds that the AEP Retirement Account referred to in the mediated agreement, which is incorporated into the Divorce Decree by reference, is the AEP System Retirement Plan (Pension). It is not the AEP System Retirement Savings Plan (Plan). That [George's] attorney shall prepare a [QDRO] to Effectuate the Division of the AEP System Retirement Plan (Pension).

The same day, the court entered a QDRO to divide the parties' interests in "the American Electric Power System Retirement Plan in which [George] is a participant."

On August 13, 2017, Montie filed a motion for a new trial or amendment of judgment requesting a ruling on her breach-of-contract claim as to the refinance. The circuit court did not rule on the motion, and it was deemed denied by operation of law after thirty days. Montie filed a timely notice of appeal on October 9, 2017. While her appeal was pending before this court, she filed a petition and an amended petition in the circuit court, asserting a claim of fraud on the court relating to George's testimony at the July 13, 2017 hearing. On September 24, 2018, the circuit court entered an order suspending the proceedings. On October 3, 2018, we dismissed without prejudice Montie's pending appeal,

10

concluding that there was not a final, appealable order because her breach-of-contract claim relating to the refinance was not decided in the circuit court's August 3, 2017 order, and she did not seek a Rule 54(b) certification.[12] The circuit court entered an order commencing the proceedings on August 14, 2019.

On August 20, 2019, Montie filed a second amended counterclaim reasserting her breach-of-contract claim relating to the refinance and also alleging that George committed fraud on the court in his July 13, 2017 testimony "knowing that the parties intended that the [AEP] System Retirement Savings Plan was included in the AEP retirement account referred to in Paragraph 9 of the [MOU]." Pursuant to Arkansas Rule of Civil Procedure 60(c)(4), she sought to set aside the circuit court's August 3, 2017 order interpreting the mediation agreement on the grounds of the alleged fraud. Alternatively, she contended that the 401(k) savings plan should be included as personal property and addressed in paragraph 6 of the parties' MOU, and she asked the court to divide it equally between the parties.

On September 14, 2020, the circuit court convened a limited hearing to allow the parties to present evidence that was not previously heard at the July 13, 2017 hearing. George testified that he believed Montie knew about his AEP-sponsored pension plan, noting, among other things, that they were married for twenty-seven years, that Montie is an accountant, and that she handled their bills and saw his pay stubs. Montie, on the other

---

[12]*Hobson I*, 2018 Ark. App. 483.

11

hand, testified that George lied in his testimony regarding her knowledge of his retirement benefits, noting that "none of [his pay stubs] refer to his pension."

Montie also testified, over George's objection, about the parties' failed attempt, in early 2017, to negotiate a QDRO for the division of George's AEP-sponsored 401(k) savings plan. According to Montie, in March 2017, George's attorney prepared and sent to her a proposed QDRO for "the AEP System Retirement Savings Plan." Montie admitted that she rejected the proposed QDRO; therefore, it was never presented to the court.[13] And she conceded that after George's attorney sent her the proposed QDRO, she did not take any steps to have her portion of the savings account transferred.

According to Montie, George never explained to her why his attorney proposed a QDRO for the savings account in March 2017, yet at the hearing in July 2017, George testified that when the parties executed the mediated property-settlement agreement in August 2015, the intention was to divide his AEP pension. Montie contended that George "simply switched the two accounts in his testimony to the court. He represented something entirely different to the court from what the parties had already been preparing to do, and the court relied on his testimony in coming to its decision that day." This, she argued, demonstrated fraud on the court and warranted setting aside the court's August 3, 2017 order. Alternatively, she argued that the 401(k) savings plan is personal property, subject to

---

[13]According to Montie, she wanted the QDRO to include earnings since the time of the divorce.

paragraph 6 of the parties' MOU, that has not been divided, and the court should intervene in the parties' inability to divide the remaining property by agreement.

George argued that the court should not go behind the parties' independent property-settlement agreement. He contended that in the eight months between the filing of the complaint for divorce and the entry of the decree, Montie could have done discovery and taken depositions, "[s]o to say that paycheck stubs didn't show it or she has to somehow mysteriously find out about things, or [George] had the duty to just volunteer information to her just goes against the very nature of the way our system works. . . . She knows how to do discovery."

The circuit court ruled from the bench as follows:

> Okay, folks, it's my turn to talk, and I want you to listen. Customarily, I end my rulings with words to the effect of, "All right, counsel, I believe I've addressed all the issues raised to the court. Is there anything else?" I didn't say exactly those words. As I finished the ruling in this case, I said "Anything further," inviting the parties to raise the issue if there was some unanswered issue before the court. In this case, nobody said anything.

> And in particular, [Montie], whom I point out, a lawyer and an accountant, didn't ask for a ruling on the breach of contract issue. If there's anybody's fault here, it probably lays with [Montie] on that issue. So we're back. We're back, and we're now dealing with a Divorce Decree that is three days short of being five years old.

> I believe there are three things I have to deal with, and one is the personal property and the retirement account with the contempt and the breach of contract. I've obviously, gone back and reviewed the ruling I made back in [20]17 and, of course, it brought back the memory of that hearing. And at this moment in time, I'm ever so much more convinced that I was absolutely spot-on at that time in regard to the contempt.

13

I do not find that [George] was in contempt of court for making the decisions he made to refinance the house and to bring it into condition necessary for it to appraise. We might point to the fact that it's been testified to, I believe last time and today, that each of these people thought that they had $40,000 equity in that house, and it wasn't there because of the issues with the home. I think they included the roof and a lot of different things. And those things had to be repaired to make the home marketable, but it's also as well to make it appraise. I think he did right. I cannot find him in contempt and will not find him in contempt on that issue.

That leaves us with the bugaboo, the breach of contract. Did [George] breach? Well, he did not meet the exact terms of the – the Settlement Agreement, the Mediation Agreement, which was also filed with the court on September 17. I think it's dated somewhat earlier. And it . . . calls on him to pay $20,000 within 60 days of the entry. He didn't do that, so I guess, in a sense, there's a technical breach.

Are there damages? She signed a year lease. It didn't say she could bail out and buy. Now, she negotiated that. I don't find that there are damages here. These were self-inflicted on her part on the decision-making. He informed her they had a problem with the house and she went ahead, so I simply don't see that there is an actionable breach of contract here.

As to the retirement account, it's been testified to by both that this lawyer/accountant managed their business. She did all their bill-paying and had copies of all of his income pay stubs, managed all of those things. And I would guess now, looking back . . . she probably thought she had her arms around what their business situation was back in [2015] when she was representing herself negotiating this transaction.

There's been a period of time when [Montie] would represent herself, then hire a lawyer for the hearing, and then go back to representing herself. That seemed to be a theme through this thing, I guess with the idea that she might save attorney's fees. I don't know.

But it is obvious, based on the activity of the last three years at least, that she's well-acquainted with the process of discovery. I don't need to lecture the lawyers on this, but the process of discovery is – the purpose is to get not only discovery evidence, but get somebody on the record as to what things are. And that way you know or can establish what the facts are you go about negotiating.

I'm sorry, the words of the Settlement Agreement, Paragraph 9, says that . . . she gets the retirement account, not the savings account, and you're stuck with the words. That's what it says. And I simply cannot find that you, as a lawyer and accountant, wouldn't pay attention to such details, or at least get him on the record as to what this was. And, accordingly, I can't rule for you on that point at all.

I'm more and more convinced that it was – he testified that he took on a significant tax debt, and I can't remember if it was forty or sixty thousand dollars. I believe I saw both numbers bandied around. But he took that on, and in the course of a mediation, there is a lot of given and take. And you're asking me, [Montie], to redo that Mediation Agreement on that point, and I'm not interested in doing that. I don't think that's appropriate in light of, in particular, the way those are negotiated and in regard to and in light of the non-disclosure elements of a mediation. So, no, I can't find that.

The personal property. Frankly, I'd like to leave you both where you are on this issue. I would really like to do that, but there has been no pleading that gives me the opportunity to do that. Both of you have testified you don't have an agreement on it, so the only remedy I can see is this. You're all going to gather everything you got. That includes everything that's in [Montie's] possession, and we're going to put it in a big pile and have an auction. That's what we're going to do.

. . . .

I do not consider the retirement account among the other category [Montie] wants to point to because it is very clear that the parties separated these things not on the basis of tables and chairs, but the accounts were separated. So that is that issue.

. . . .

There's no fraud on the court. . . . Not even close. . . . The proof simply is not there.

15

The circuit court's bench rulings are memorialized in an amended final order entered on November 4, 2020. The November 4 order also resolved the parties' requests for attorney's fees as follows:

> 1. [Montie] shall pay attorney's fees to [George] in the amount of $10,245.00 to be paid within 30 days of the entry of this order.

> 2. No fees are awarded to [Montie] for success in establishing a breach of contract. The Court notes that the breach of contract was a technical breach but there was no damage to [Montie] because of her own acts.

Montie filed a timely notice of appeal on November 23, 2020.

We review appeals of domestic-relations proceedings de novo, but we do not reverse unless we determine that the circuit court's findings were clearly erroneous.[14] A circuit court's finding of fact is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made.[15] In reviewing a circuit court's findings, we defer to the circuit court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony.[16] We, however, do not defer to a circuit court's conclusion on a question of law. If the circuit court erroneously

---

[14]*Artman v. Hoy*, 370 Ark. 131, 135, 257 S.W.3d 864, 868 (2007).

[15]*Id.*

[16]*Oliver v. Oliver*, 70 Ark. App. 403, 405–06, 19 S.W.3d 630, 632 (2000).

16

applied the law, and the appellant suffered prejudice as a result, we will reverse the circuit court's erroneous ruling on the legal issue.[17]

Montie first argues that the circuit court erred in denying her claim for breach of contract based on George's late refinancing relating to the marital residence. To establish an actionable claim for breach of contract, she had to prove the existence of an agreement, breach of the agreement, and resulting damages.[18] The circuit court found that there was a "technical breach" of the parties' property-settlement agreement but that, even so, there were no recoverable damages. More specifically, the court found that Montie failed to mitigate her damages, concluding that the damages alleged were "self-inflicted."

The duty to mitigate damages is often called the "doctrine of avoidable consequences."[19] Under this doctrine, a party cannot recover damages resulting from consequences that she could have reasonably avoided by reasonable care, effort, or expenditure.[20] Reasonable diligence and ordinary care are all that are required.[21] The burden of proving that a nonbreaching party could have avoided some or all of the damages by acting prudently rests on the breaching party, not only on the question of causation of

---

[17]*Id.*

[18]*Keith Capps Landscaping & Excavation, Inc. v. Van Horn Constr., Inc.*, 2014 Ark. App. 638, at 5, 448 S.W.3d 207, 210.

[19]*Greenway Equipment, Inc. v. Johnson*, 2020 Ark. App. 336, at 8, 602 S.W.3d 142, 149.

[20]*Id.*

[21]*Id.* at 9, 602 S.W.3d at 150.

damages for failure to avoid harmful consequences, but also on the question of the amount of damage that might have been avoided.[22] Generally, whether one acted reasonably in minimizing, mitigating, or avoiding damages is a question of fact.[23]

Montie and George executed their mediated property-settlement agreement on August 28, 2015. As part of the agreement, Montie did not have to move out of the marital residence until sixty days after the parties had met and divided their personal property.[24] Nevertheless, just days after entering into the agreement but before the settlement was approved, Montie signed a one-year lease and moved into a rental house. She did this, as the circuit court found, despite knowing early on that George was having difficulty refinancing. Montie contends that the circuit court's finding in this respect was clearly erroneous. She maintains that she did not yet know about the refinancing issues when she signed the lease and moved out, noting that George submitted his first loan application on October 8, 2015.[25] At the July 13, 2017 hearing, however, she testified that she was aware of George's pre-decree refinancing efforts and that she had been in direct contact with the bank until mid-October 2015.

---

[22]*Id.* at 9–10, 602 S.W.3d at 150.

[23]*Id.* at 10, 602 S.W.3d at 150.

[24]It was not until September 2020 that Montie and George finally divided all the personal property.

[25]We note that Montie testified that she was in contact with the bank until mid-October 2015.

For argument's sake, assuming Montie did not know about the refinancing issues when she signed the lease on September 2, 2015, she asserts on appeal, and conceded below, that she could have terminated the lease with written notice. Yet, she did not attempt to terminate the lease. Moreover, George presented evidence—a January 31, 2016 email—showing that Montie contemplated moving back into the marital home until it could be sold or until George was able to refinance. At the time, Montie, in fact, had already petitioned the court for an order directing the sale of the marital home and for reimbursement for life insurance premiums she had paid up to that point. But instead of pursuing her rights, she voluntarily dismissed her petition, remained in the rental house, and continued to pay life insurance premiums. More than a year after the divorce was final, and several months after George had completed the refinance and she had purchased the rental home, she brought a breach-of-contract action for damages that the circuit court found she could have avoided. The circuit court reviewed and weighed the evidence presented and found that Montie did not act reasonably in mitigating damages.[26] We cannot say that the circuit court's finding was clearly erroneous under these facts.

Montie next argues that the circuit court erroneously interpreted the parties' mediated property-settlement agreement vis-à-vis the division of retirement assets. She

---

[26]We do not address Montie's contention that the circuit court erred in finding affirmative defenses that were not raised in George's answer because she does not sufficiently develop the argument or cite any authority to support the argument. *Wilson v. Pulaski Bank & Tr.*, 2011 Ark. App. 383, at 9, 383 S.W.3d 919, 924.

19

contends that the term "the AEP retirement account" in paragraph 9 of the MOU is not ambiguous and "should include all the AEP retirement, not part of it."[27]   Alternatively, she argues that George's 401(k) savings plan is included as personal property addressed in paragraph 6 of the MOU.  We disagree.

When parties enter voluntarily into an independent property-settlement agreement that is incorporated into a decree of divorce, the agreement cannot subsequently be modified by the court.[28]  Property-settlement agreements, especially once approved by a circuit court, are considered binding and final contracts between parties.[29]  Such agreements, however, remain subject to judicial interpretation, and the rules of contract construction apply.[30] When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the written agreement according to the plain meaning of the language employed.[31]  When a contract is unambiguous, its

---

[27]Montie labels what George described in his testimony as his pension plan as the "ROTH401K" and what he described as his 401(k) savings plan as the "AEP RSP." We note, however, that no testimony or evidence from the plan administrator was presented to establish the official names of the plans or the specific nature of the retirement benefits in dispute.

[28]*Duncan v. Duncan*, 2011 Ark. 348, at 8, 383 S.W.3d 833, 838.

[29]*Id.*

[30]*Pittman v. Pittman*, 84 Ark. App. 293, 298, 139 S.W.3d 134, 136 (2003).

[31]*Id.*

construction is a question of law for the court, and the intent of the parties is not relevant.[32] When the meaning of the words is ambiguous, parol evidence is admissible to explain the writing.[33] When, on the face of the document, the reader can tell that something must be added to the written contract to determine the parties' intent, the ambiguity is patent.[34] Conversely, a latent ambiguity arises from undisclosed facts or uncertainties of the written instrument.[35] The initial determination of the existence of an ambiguity in a written contract rests with the circuit court, and if an ambiguity exists, then parol evidence is admissible, and the meaning of the term becomes a question for the fact-finder.[36]

In this case, the circuit court properly treated the disputed language as latently ambiguous. The ambiguity in the term "the AEP retirement account" arises because, as George testified, there are actually two distinct accounts—a retirement pension plan and a separate 401(k) savings plan.[37] The parties' testimony as to whether the intention when they executed the mediation agreement was to divide the 401(k) savings plan was in conflict.

---

[32]*Oliver v. Oliver*, 70 Ark. App. 403, 407, 19 S.W.3d 630, 633 (2000).

[33]*Pittman*, 84 Ark. App. at 298, 139 S.W.3d at 136.

[34]*Id.*

[35]*Id.*

[36]*Id.*, 139 S.W.3d at 136–37.

[37]*See Oliver*, 70 Ark. App. at 407, 19 S.W.3d at 633 (noting that a latent ambiguity may arise when, although an asset's description appears clear on its face, "it turns out that there is more than one [asset] to which the description applies").

Because of the language employed by the parties in their written agreement and the parties' testimony, the circuit court concluded that "the AEP retirement account" included George's pension plan but not the 401(k) savings plan. It likewise concluded that the 401(k) savings plan was not otherwise included in paragraph 6 of MOU, the provision for the division of personal property. These conclusions are supported by the testimony and evidence presented.

A reading of the MOU shows that there was a give and take with respect to the parties' allocation of various marital assets and debts. The parties included separate and distinct provisions addressing, among other things, custody and child support and specific categories of marital assets and debt including real property, personal property, vehicles, retirement assets, tax debt, and credit card debt. The separate provision for the division of retirement assets says that Montie will receive ownership of her multiple retirement accounts, George will receive ownership of his Entergy retirement annuity, and Montie will receive 53 percent of a separate account identified as "the AEP retirement account." George believed that the parties had agreed for Montie to receive 53 percent of his AEP-sponsored pension but that he would keep his 401(k) savings, just as Montie kept her various accounts. Montie, on the other hand, believed that the agreement was for her to receive "53 percent of whatever retirement account or accounts." At the same time, she maintained that when they entered the agreement, she knew about only one account: the 401(k) savings account. As the circuit court correctly found, however, none of the provisions in the parties' agreement address a 401(k) savings account.

22

As the circuit court also noted, Montie and George each were represented by separate counsel during mediation, and Montie, herself an attorney, could have discovered the information necessary to accurately determine George's retirement benefits before entering into the mediation agreement. Admittedly, she chose not to do so. Instead, nearly two years postdecree, she urged the circuit court to interpret the parties' independent property-settlement agreement such that she receives 53 percent of any and all of George's retirement accounts, including a 401(k) savings plan that is not mentioned in any part of the parties' written agreement. The circuit court properly declined to do so, noting that if the parties had intended to divide the 401(k) savings plan, such a provision could have been included in the agreement. Giving deference to the circuit court's "superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony[,]"[38] as we must, we cannot say that the circuit court's conclusions were clearly erroneous.

We can easily dispose of Montie's assignment of error by the circuit court in rejecting her claim of fraud on the court. Montie's argument consists of a conclusory assertion that George "misrepresented his AEP retirement under oath to prevent [her] from getting her 53% of the AEP RSP." Furthermore, Montie does not assert any legal authority to support the argument. We may refuse to consider an argument when an appellant fails to cite any legal authority, and the failure to cite authority or make a convincing argument is sufficient

---

[38]*Oliver*, 70 Ark. App. at 405, 19 S.W.3d at 632.

reason to affirm.[39]   In any event, the party seeking to set aside a judgment on the basis of fraud has the burden of proving fraud by clear, cogent, and convincing evidence.[40]   Montie plainly failed to meet this burden.   The circuit court, therefore, properly rejected her claim of fraud on the court.

Montie next argues that the circuit court abused its discretion in awarding attorney's fees to George and not to her as the prevailing party in the breach-of-contract action.[41]   We disagree.   The circuit court is always free to exercise its inherent authority to grant fees in domestic-relations cases, and the decision to award fees and the amount of those fees are matters within the discretion of the circuit court.[42]   Absent an abuse of that discretion, an award of fees will not be disturbed on appeal.[43]

Montie's contention that George was not entitled to attorney's fees because he did not prevail on several motions is not well founded.   In determining the prevailing party for purposes of awarding attorney's fees, "the analysis is in terms of cases, not in terms of discrete

---

[39]*Moody v. Moody*, 2017 Ark. App. 582, at 12, 533 S.W.3d 152, 160.

[40]*Cummings v. Cummings*, 2016 Ark. App. 375, at 6, 499 S.W.3d 221, 225.

[41]*See* Ark. Code Ann. § 16-22-308 (Repl. 1999) ("In any civil action to recover . . . for . . . breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.").

[42]*Goodson v. Bennett*, 2018 Ark. App. 444, at 20–21, 562 S.W.3d 847, 861.

[43]*Id.*

issues within cases[.]"[44] The circuit court addressed Montie's objection to George's attorney's-fees request based on "unnecessary motions" in a letter to the parties' attorneys, noting that Montie "does not have clean hands on this issue. Fees of $10,245.00 are allowed to [George]." Furthermore, as the circuit court plainly found, Montie did *not* prevail in the breach-of-contract action—she failed to establish recoverable damages resulting from the "technical breach." Thus, she failed to prove a necessary element to prevail on a claim for breach of contract. For these reasons, we affirm the circuit court's decision with respect to attorney's fees.

Montie next challenges the circuit court's exclusion of certain evidence at the September 14, 2020 hearing: (1) emails she sent to her attorney after the divorce regarding transfer of her interest in George's AEP retirement account to her UTMG retirement account; (2) testimony and documents relating to an offer in compromise that George submitted to the IRS after the divorce; (3) copies of a cover letter and proposed QDRO prepared by George's attorney in March 2017; and (4) a 1099 form relating to George's withdrawal of funds from his 401(k) savings in 2010. She argues that this evidence was relevant to the parties' knowledge and intent when they executed the mediation agreement in August 2015. We will not reverse a circuit court's evidentiary ruling absent an abuse of

---

[44]*Swaffar v. White*, 2024 Ark. App. 417, at 16, 697 S.W.3d 726, 735.

discretion and a demonstration of prejudice.[45]  For the reasons that follow, we affirm the circuit court's evidentiary rulings.

As to the disputed emails, Montie testified, "I sent several emails to my attorney asking why hadn't [the 53 percent interest in the AEP retirement account] gone into my UTMG account yet."  When she started to describe the first email she sent on January 18, 2016, George's attorney objected.  The circuit court asked how Montie's understanding with her lawyer had anything to do with George, to which Montie's attorney responded that it shows "the parties, both of them, moved towards dividing the savings account, and then [George] testified to you the opposite."  In sustaining the objection, the circuit court stated, "I don't think that her conversations with her lawyer have anything to do with [George]. . . . Unless you've got something showing [George] responded affirmatively, let's move on."  It is not apparent from the record that Montie ever moved for admission of the emails.  Our review of their exclusion is precluded, in any case, because Montie failed to proffer the proposed emails.[46]  Montie, moreover, cannot demonstrate prejudice, given that she was permitted to testify at length about the parties' postdecree actions regarding the transfer of her interest in the retirement benefits.

As to the testimony and documents relating to an offer in compromise that George submitted to the IRS *after* the divorce, we cannot say that the circuit court abused its

---

[45]*Goodson*, 2018 Ark. App. 444, at 22, 562 S.W.3d at 862.

[46]*See Tilmon v. State*, 2022 Ark. App. 291, at 9, 646 S.W.3d 286, 291 (generally, failure to make proffer of excluded evidence precludes review of the issue on appeal).

discretion in concluding that the evidence was not relevant to the parties' intention at the time they executed the mediation agreement in August 2015. Montie, moreover, makes no attempt to demonstrate prejudice.

Montie, likewise, suffered no prejudice from the circuit court's exclusion of paper copies of a cover letter and proposed QDRO prepared by George's attorney in March 2017 for division of the "AEP System Retirement Savings Plan." The circuit court allowed Montie, over George's objection, to testify at length about the circumstances relating to the proposed QDRO.

Last, it is not apparent from the record that Montie ever moved for admission of the 1099 form in question, although she included it when she proffered various other documents. In any case, Montie testified without objection that George took out loans from his 401(k) savings in 2009 and 2010, and she explained that those loans are reflected in George's pay stubs, which were admitted into evidence. The 1099 form at issue simply shows that George took a distribution from his 401(k) savings plan in 2010. Thus, assuming the 1099 form was excluded, Montie, again, cannot demonstrate prejudice.

In her final point for reversal, Montie challenges the denial of her request to deem admitted requests for admission that she served on George on September 10, 2018.[47] On

---

[47]George moved to suspend the proceedings on September 7, 2018, arguing that the issues involved in Montie's new petition and requests for admission were currently on appeal. As mentioned, the circuit court entered an order suspending the proceedings September 24, 2018, and entered an order commencing the proceedings on August 14, 2019.

September 5, 2019, Montie moved to deem the requests admitted. She contended that while George admittedly was timely in *responding* to the requests for admission, he did not timely *file* his responses with the court as required by Arkansas Rule of Civil Procedure 5. Following a hearing, on November 26, 2019, the circuit court entered an order denying Montie's motion as follows:

> 2. That the Court finds that, given that the case herein was suspended and then, unsuspended, the circumstances and timing are unusual; the Court further finds that there was substantial compliance on the part of [George] with the Arkansas Rules of Civil Procedure.
>
> 3. That [Montie's] Motion to Deem First Set of Requests for Admission Admitted is dismissed.

The circuit court, in its August 14, 2019 order to commence the proceedings, gave George "until and including August 22 to respond to the pending Requests for Admissions of Fact." Montie admitted that, on August 19, George served his responses to the requests for admission on her—well before the court's August 22 deadline. She also admitted that George filed his responses to the requests for admission on September 6, 2019. She now argues that the circuit court erred by refusing to deem her requests admitted. We disagree.

A circuit court has broad discretion in matters pertaining to discovery, and we will not reverse a circuit court's decision on a discovery matter absent an abuse of discretion that is prejudicial to the appealing party.[48] Under Arkansas Rule of Civil Procedure 36, a matter of which an admission is requested "is admitted unless, within thirty days after service of the

---

[48]*Hardesty v. Baptist Health*, 2013 Ark. App. 731, at 4, 431 S.W.3d 327, 330.

request, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party of by his attorney."[49]  Rule 36's time periods, however, "may be shortened or lengthened by the court."[50]

Rule 5(c)(1), in turn, provides that "[a]ll papers after the complaint required to be served upon a party or his attorney shall be filed with the clerk of the court either before service or within a reasonable time thereafter."  Discovery documents, like depositions, interrogatories, requests for production or inspection, and answers and responses thereto, however, "shall not be filed unless ordered by the court."[51]

In this case, the circuit court entered an order suspending the proceedings fourteen days after Montie served George with the disputed requests for admission.  When the court entered its order to commence the proceedings, it set a new time period for George to respond to the requests for admission.  George served his responses to the requests well within that time period.  He also filed those responses within a reasonable time—eighteen days later. For these reasons, we conclude that the circuit court properly denied Montie's motion.

Affirmed.

---

[49]Ark. R. Civ. P. 36(a).

[50]*Id.*

[51]Ark. R. Civ. P. 5(c)(1).

VIRDEN and HIXSON, JJ., agree.

*Montie Hobson*, pro se appellant.

One brief only.