Cite as 2025 Ark. App. 537

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-24-426

| | | |
|---|---|---|
| STEVE L. JONES | | Opinion Delivered November 5, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION |
| V. | | |
| | | [NO. 60CV-21-6824] |
| MNLRN, LLC | | |
| | APPELLEE | |
| | | HONORABLE MORGAN E. WELCH, JUDGE |
| | | |
| | | AFFIRMED |

## KENNETH S. HIXSON, Judge

This case concerns the assignment of a sublease for property in North Little Rock (hereinafter "the Property") used for the operation of a car dealership. The lessee/sublessor of the property was appellant Steve L. Jones (hereinafter "Jones"), and the assignee of the sublease was appellee MNLRN, LLC.[1] The controversy involves the parties' disagreement as to which party had the right to exercise a five-year option to renew the lease. After a bench trial, the trial court decided the issue in favor of MNLRN and entered a declaratory judgment, from which Jones now appeals. The trial court later entered a separate order awarding MNLRN $38,645 in attorney's fees, and Jones appeals from that order as well.

On appeal, Jones raises four arguments: (1) the trial court erred in denying Jones's request for a jury trial; (2) the trial court erred in finding that there was consideration provided by

---

[1]MNLRN is the owner and operator of McLarty Nissan.

MNLRN to support the formation of a contract; (3) the trial court erred in finding that the contract was not ambiguous and in failing to construe the ambiguities against MNLRN; and (4) if the underlying judgment is reversed, the attorney's fees should also be reversed. We affirm.

I. *Facts and Procedural History*

On July 16, 1996, the Property owners, Joe Edd Hawkins and R.L. Summers, entered into a lease agreement (hereinafter the "Prime Lease") with appellant Steve L. Jones and his father, Herbert J. Jones, Sr. The Prime Lease provided that Jones would lease the Property for eight years beginning on October 8, 1996, and pay $15,000 in monthly rent.[2] The Prime Lease gave Jones the option to renew the initial term for an additional period of twelve years.

In October 2004, near the end of the original eight-year term of the Prime Lease, Jones exercised the option to renew the Prime Lease for the additional twelve-year renewal term. The twelve-year renewal term extended the Prime Lease through October 8, 2016. Shortly after the twelve-year option was executed, on November 3, 2004, the Property owners entered into an addendum with Jones that amended the Prime Lease and granted Jones the option—following the expiration of the twelve-year renewal term—to renew the lease for two additional periods of five years each.

During the first Prime Lease extension term, on April 21, 2005, Jones sold his dealership operations on the Property to Asbury Group (hereinafter "Asbury"), which wanted to use the site to operate a Nissan dealership. In connection with the sale, Jones subleased the Property to

---

[2]Herbert J. Jones, Sr., later assigned all his rights in the Prime Lease to Steve L. Jones.

Asbury (hereinafter the "Sublease").[3]  The term of the Sublease commenced on April 21, 2005, and was coterminous with the term of the Prime Lease, including any option period if exercised by Jones under the Prime Lease.  The Sublease required Asbury to make the rent payments of $15,000 under the Prime Lease and make an additional monthly payment of $10,000 to Jones for the Sublease.

In 2015, toward the end of the original Sublease term, Asbury entered into negotiations to sell the Nissan dealership to MNLRN.  On December 14, 2015, the Property owners, along with Jones as sublessor and Asbury as assignor, entered into an assignment of the Sublease (hereinafter "Sublease Assignment") with MNLRN as assignee.  Pursuant to the Sublease Assignment, all rights, title, interest, and obligations under the Sublease were assigned to MNLRN.  Paragraph 2 of the Sublease Assignment provides:

> The parties acknowledge and agree that the term of the Sublease is to be coterminous with the term of the Lease, including, without limitation, the primary term and any option period, unless the Lease or the Sublease is sooner terminated in accordance with the terms and conditions set forth therein or herein.  In connection with this Agreement, the parties acknowledge and agree that the first five (5) year renewal term is hereby exercised such that the Sublease Term shall expire on October 8, 2021, unless otherwise renewed or sooner terminated in accordance with the term of the Lease or Sublease.  In addition, the parties intend to grant the right with respect to the exercise of any renewal option left with respect to the Lease or the Sublease *solely to Assignee* [MNLRN], which, if and to the extent necessary, is hereby acknowledged as a modification and amendment under the Lease and the Sublease that is agreed to by the Landlords and the Sublessor.

(Emphasis added.)  Paragraph 5 of the Sublease Assignment provides:

> The Landlords [Joe Edd Hawkins and R.L. Summers] and the Sublessor [Jones] each hereby consent to Assignor's [Asbury's] assignment of the Sublease to Assignee [MNLRN], and the Assignee's assumption of the Sublease from Assignor, pursuant to the terms of this Assignment.  The Landlords and the Sublessor each further confirm

---

[3]The Property owners gave written consent for the Sublease.

3

and agree the Sublease in is full force and effect and has not been modified, supplemented or amended in any way and the Lease and the Sublease represent the entire agreement between the parties as to this leasing and/or rights, duties, obligations, and responsibilities of Assignor under the Lease or the Sublease. Further there are no oral agreements or understandings between the Landlords or the Sublessor (and their predecessors and/or successors if applicable) and Assignor with respect to the sublease or any obligations of any party thereunder.

Jones also executed an Estoppel Certificate stating it was effective as of "____, 2015."[4]

Paragraph 1(c) of the Estoppel Certificate provides:

The Lease is in full force and effect and there are no other covenants or agreements between Sublessor and Lessor relating to the Lease or the Premises. The Sublease is in full force and effect and there are no other covenants or agreements between Sublessor and Current Tenant[5] relating to the Sublease or the Premises, or which would otherwise be binding on a successor to Current Tenant as a successor sublessee of the Premises in favor of the Sublessor.

Paragraph 1(g) of the Estoppel Certificate provides:

The Lease has two extension options in favor of the Sublessor [Jones] thereunder. The first option ("First Option"), if exercised by the lessee [Jones] as provided in the Lease, will operate to extend the term of the Lease from October 8, 2016 until October 8, 2021. Pursuant to that certain Assignment of Sublease of even date herewith, the First Option will be exercised to extend the Lease as such. The second option ("Second Option"), if exercised by the Sublessee [Asbury assigned to MNLRN] as provided in the Lease, will extend the term of the Lease until October 8, 2026. The terms of the Sublease grant to the Current Tenant (and NLRN[6] as the assignee) the same Second Option to extend the term of the Sublease through October 8, 2026.

---

[4]At trial, Jones testified that he executed this document in December 2015.

[5]The Estoppel Certificate identifies Asbury as the "Current Tenant."

[6]The Estoppel Certificate equates "McLarty NLRN, LLC" with NLRN.

Following the 2015 sale of the Nissan dealership from Asbury to MNLRN, MNLRN operated the Nissan dealership on the property. As part of its operations, MNLRN made the rental payments and satisfied other obligations under the Prime Lease and the Sublease.

On September 8, 2021—about a week before the October 8, 2021 lease-termination date—Jones sent a letter to the Property owners notifying them of his intent to exercise the remaining renewal option and renew the lease for the second five-year term beginning October 8, 2021. In his letter, Jones stated, "It is my understanding that the Sublessee, McLarty NLRN, LLC, desires to renew its sublease with me, it has not notified me otherwise, but this has not been confirmed to me by McLarty." On October 4, 2021, one of the Property owners[7] wrote a response letter to Jones stating that "as we read and interpret the Assignment of Sublease document, the only entity that can exercise the remaining renewal option is the Assignee, which in this case is McLarty NLRN, LLC." The Property owner forwarded Jones's letter to MNLRN. On October 4, 2021, MNLRN sent a letter to Jones stating that the Sublease Assignment granted the second five-year renewal option solely to MNLRN, that it did not wish to extend the lease, and that Jones's attempt to exercise the renewal option was invalid. On October 6, 2021, MNLRN purchased the Property from the fee-title owners. Jones nonetheless continued to make demand of the monthly rental payment from MNLRN.

On October 26, 2021, MNLRN filed a complaint against Jones seeking both declaratory and injunctive relief. MNLRN asked the trial court to find that, pursuant to the terms of the Sublease Assignment, MNLRN was the only entity authorized to exercise the final five-year

---

[7]Upon the death of Joe Edd Hawkins, his interest in the Prime Lease was conveyed to 5703 Landers Road, LLC, and the managing partner of that LLC responded to Jones's letter.

5

renewal option for the Prime Lease and the Sublease; that MNLRN did not exercise the option; and that Jones's attempt to exercise the option was unauthorized and of no effect. MNLRN also asserted that it was the owner of the Property and asked the trial court to enter injunctive relief ordering Jones to cease and desist all interference with MNLRN's use and enjoyment of the Property.

On December 2, 2021, Jones filed an answer and counterclaim for declaratory relief and breach of contract. Jones sought to have the trial court declare that the Sublease Assignment did not assign Jones's right to extend the lease to MNLRN, and even if it did, it was unenforceable because no consideration was provided to Jones for foregoing his right to exercise the final renewal option. Jones further asked the trial court to declare that Jones had the sole right to exercise the final five-year renewal option; that he properly exercised that option; that MNLRN was in default of the Sublease; and that Jones be granted possession of the Property. In his breach-of-contract claim, Jones alleged that MNLRN had breached the Prime Lease and the Sublease by not making the October and November 2021 payments, and he sought damages. Jones's answer and counterclaim demanded a jury trial on all issues triable to a jury under Arkansas law.

The parties filed cross-motions for summary judgment. In an order entered on July 7, 2022, the trial court denied both motions.

On July 19, 2022, Jones sent an email requesting a jury-trial setting and claiming entitlement to a jury trial as to issues of fact and his claim for breach of contract. MNLRN responded and asserted that a jury trial was not appropriate because both parties had requested declaratory-judgment relief, which is a matter of equity.

6

On September 8, 2022, the trial court entered an order denying Jones's request for a jury trial and ordering bifurcation of claims. In that order, the trial court quoted from *Stokes v. Stokes*, 2016 Ark. 182, 491 S.W.3d 113, where the supreme court held that the constitutional right to a jury trial does not extend to a case in equity. The trial found:

> Applying that analysis, this Court concludes the nature of the main case, and the primary claims of BOTH adversaries, sound in EQUITY: Declaratory Judgment. In so concluding, the Court is not unmindful of the Defendant's additional prayer for Breach, [and] FINDS that claim is parasitic of the Declaratory Judgment (that Defendant must first prevail on his claim for Declaratory Judgment before becoming entitled to proceed for Breach), that a jury trial would be impractical under the circumstances prior to adjudication of declaratory judgment, and that that portion of the Counterclaim should be BIFURCATED.

> IT IS, THEREFORE, ORDERED that the case will proceed, first, to a Bench Trial on the issue of Declaratory Judgment, and any other pending equitable matters. IT IS FURTHER ORDERED that should Defendant prevail on Declaratory Judgment; the matter of Breach will be tried to a jury. IT IS FURTHER ORDERED that the Clerk should issue a Scheduling Order for BOTH SETTINGS, FORTHWITH.

A two-day bench trial was held on March 6–7, 2024. At the bench trial, the parties presented witnesses and exhibits in support of their respective positions.

Michael Holland, the treasurer and chief financial officer of McLarty Automotive Group and treasurer of MNLRN, testified that he managed MNLRN's finances, which included paying MNLRN's obligations under the Sublease Assignment. Holland testified that MNLRN made monthly payments under the Prime Lease to the Property owners, made monthly payments to Jones under the Sublease, and paid utilities, taxes, and maintenance expenses on the Property. According to Holland, MNLRN made these payments from December 14, 2015 (the date of the Sublease Assignment) through the end of the first five-year extension period, October 8, 2021.

Jones also testified and discussed the negotiations surrounding the sale of the dealership from Asbury to MNLRN in December 2015 and the corresponding Sublease Assignment executed by the parties. Jones stated that, in the event the dealership had closed down—whether Asbury or MNLRN had owned it—Jones would have taken over the Property and the dealership and would have been leasing the Property from the Property owners for $15,000 a month. Jones also stated that, had the parties not agreed to exercise the first five-year lease option through October 8, 2021, he would have taken over the Property and been responsible for all the financial obligations, including the rent, taxes, utilities, and maintenance expenses under the Prime Lease. Jones indicated that, had he resumed possession of the Property under either of those circumstances, he would probably have been able to sublease the property for a greater amount than he was receiving under the Sublease and have been better off. Jones stated that he thought he had the right to exercise both the first and second five-year lease extensions and that he did not relinquish his right to receive a total of $600,000 that he would have received through October 8, 2026 under the second extension.

Mark Riable was Jones's attorney during the negotiations in December 2015 concerning the sale of the dealership from Asbury to MNLRN and the Sublease Assignment. Riable testified that these negotiations among the attorneys were conducted via email.

These December 2015 email exchanges were introduced into evidence. During negotiations, on December 1, Jones asked for a commitment for the balance of the Sublease and options though October 2026. On December 6, Asbury responded:

> [Y]ou mentioned wanting a commitment from McLarty to stay on the premises through 2026. I do not believe that the landlord or sublandlord can make this a requirement to granting consent under the lease documentation. So, if this is going to be an obstacle in

8

the consent process, please let me know so that we can discuss how best to handle this without putting the underlying transaction at risk.

On December 8, Asbury sent an email to the parties stating, "Although a commitment on the renewal is not required in order to assign or sublet the premises, Asbury and McLarty are willing to make certain concessions to move this along." That email stated further:

> In exchange for agreeing to commit to one renewal, the parties propose: Asbury assigns the sublease to the buyer (MNLRN). Buyer, as part of the assignment, will agree to the first extension (October 2021). Buyer will control the exercise of the 2nd five-year renewal option thereafter.

On December 10, Asbury sent an email to the parties stating, "It is our understanding that an agreement has been reached on the proposed assignment of the lease," and attached several documents, including the Sublease Assignment "for your review." On December 11, Asbury sent an email stating, "Per my discussions with Mark this morning, I have made a few minor changes to the documents referenced below," and attached several documents, including the updated Sublease Assignment after discussions with Jones's attorney. That email stated:

> Please disregard the documents I attached to yesterday's email. The documents attached to this email will be considered the most recent and final documents for this assignment. Please let me know if you have any questions or comments.

Three days later, on December 14, the parties exercised the Sublease Assignment that included paragraph 2, providing that the first five-year lease extension would be exercised and that the right to exercise any further renewal option was left solely to the assignee, MNLRN.

On March 20, 2024, the trial court entered a Declaratory Judgment and Order. The Order states, "The First Phase was presented to the Court in a bench trial on March 6 & 7, 2024. . . . This Order addresses the Bench Trial, and all equitable issues. In light of the rulings,

*infra*, this Order, also, disposes of the need for a second trial." The trial court made these findings:

1. The Court FINDS the lease terms at issue are UNAMBIGUOUS, and in plain language. There was little disagreement at trial about the MEANING of terms.

2. The Court FINDS the 2015 Lease Modification gave the SOLE RIGHT to extend the lease beyond 2021 to Plaintiff, MNLRN.

3. This sole right was FULLY DISCLOSED in the negotiation emails, documents, modifications, and proposed modifications, thereto, as referred to in correspondence between counsel, exchanged from November 24 to December 11, 2015.

4. The negotiations resulted in a guarantee that Plaintiff would accede to, and exercise the first 5-year option, thus modifying the original agreement. The Court FINDS the guaranteed exercise of this first option, to the extent that it was folded into the modified General Agreement, five years early, provided a level of financial certainty to Defendant, to be sufficient "consideration" for the transaction. In *Bloodworth v. Booser*, 99 Ark. 238, 138 S.W. 457 (1911), the Supreme Court held that consideration is sufficient if what is given is of "some value" even though "it may only be of slight value." *See also Go v. Crossett Health Foundation d/b/a Ashley Co. Medical Center*, 2012 Ark. App. 83, 389 S.W.3d 28 (2012).

5. The Court FURTHER FINDS that the modification was fully disclosed to Mr. Jones and his counsel and was a topic of negotiation resulting in the early exercise of the first option, referred to *supra.*

6. Finally, the Court FINDS Mr. Jones to be a "sophisticated" party, well-versed in business transactions of this type, who was represented by knowledgeable and skillful counsel. Mr. Jones engaged in an arms-length transaction, with sufficient time for reflection.

7. The Court FINDS the Estoppel Certificate is not an issue, as it was not "executed contemporaneously by the same parties in the course of the same transaction." *See Stokes v. Roberts*, 289 Ark. 319, 322-23, 711 S.W.2d 757, 759 (1986). Because the Estoppel Certificate is not part of the same transaction, it should not be considered when interpreting the Assignment of Sublease. Regardless, however, even considering the Certificate, the result would be the same, inasmuch as it restates the right of *Plaintiff* to extend the lease.

8. The Court FINDS Defendant voluntarily and knowingly entered into the Lease Modification, and that the same was properly executed in all respects.

In the Order, the trial court issued a declaratory judgment that declared: MNLRN was the only entity authorized to exercise the final five-year renewal option for the Prime Lease and the Sublease; MLNRN did not exercise that right, and as a result, the Prime Lease and the Sublease expired by their terms on October 8, 2021; Jones did not have any authority to exercise the final five-year renewal option, and any attempt to do so was unauthorized and of no effect; and MNLRN has no further obligations to Jones under the terms of either the Prime Lease or the Sublease. The trial court also granted MLNRN permanent injunctive relief, ordering Jones to cease and desist from future interference with MNLRN's use and enjoyment of the Property. The trial court ordered the jury trial removed from the docket and dismissed Jones's counterclaim with prejudice, finding that any need for a jury trial was obviated by the trial court's rulings and was moot.

On March 25, 2024, MNLRN filed a motion for attorney's fees under Ark. Code Ann. § 16-22-308 (Repl. 1999) for prevailing against Jones's breach-of-contract claim. On April 12, 2024, the trial court entered an order awarding MNLRN $38,645 in attorney's fees.

Jones timely appealed from the Declaratory Judgment and Order and from the order awarding attorney's fees.

## II. *Jones's Arguments on Appeal*

On appeal, Jones argues that (1) the trial court erred in denying Jones's request for a jury trial; (2) the trial court erred in finding that there was consideration provided by MNLRN to support the formation of a contract; (3) the trial court erred in finding that the contract was not

ambiguous and in failing to construe the ambiguities against MNLRN; and (4) if the underlying judgment is reversed, the attorney's fees should also be reversed. We review each argument in turn.

### A. The Trial Court Erred in Denying Jones's Request for a Jury Trial

Jones's first argument on appeal is that the trial court erred in denying his request for a jury trial. Jones asserts that because his counterclaim asserted a claim for breach of contract, which sounds in law, not equity, he was entitled to a jury trial.

Jones argues further that the trial court erred in finding that because both parties filed actions for declaratory relief and these were the primary claims in the case, he was not entitled to a jury trial. Here, both parties filed for a declaratory judgment under Ark. Code Ann. § 16-111-102 (Repl. 2016), asking for a determination as to the construction and validity of the parties' written contract.[8] Jones notes that Rule 57 of the Arkansas Rules of Civil Procedure provides, "The procedure for obtaining a declaratory judgment pursuant to Ark. Code Ann. §§ 16-111-101 through 16-111-111 shall be in accordance with these rules, and the right to trial by jury may be demanded under the circumstances and in the manner provided in Rules 38 and 39." Arkansas Code Annotated section 16-111-109 is titled "Jury Trial" and provides, "When a proceeding under this chapter involves the determination of an issue of fact, such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." Pursuant to these provisions, Jones

---

[8]MNLRN also sought injunctive relief.

12

contends that he was wrongfully denied a jury trial and that we should reverse and remand for a trial by jury.

The appellate court employs a de novo standard of review for claims to a right to a jury trial. *Bandy v. Vick*, 2020 Ark. 334, 608 S.W.3d 903. We are not bound by the trial court's decision; however, a trial court's interpretation will be accepted as correct on appeal in the absence of a showing that the trial court erred. *Rowe v. Hobbs*, 2012 Ark. 244, 410 S.W.3d 40.

The Arkansas Constitution does not ensure the right to a jury in all possible instances, but rather in those cases where the right to a jury trial existed when the constitution was framed. *Bauer v. Beamon*, 2023 Ark. 194, 678 S.W.3d 782. Further, the right to a jury trial extends only to those cases that were subject to trial by jury at the common law. *Williams v. Baptist Health*, 2020 Ark. 150, 598 S.W.3d 487. In equitable proceedings, there was no right to a jury trial at the common law. *Id.* Thus, the constitutional right to a jury trial does not extend to cases in equity. *In re Estates of McKnight v. Bank of Am., N.A.*, 372 Ark. 376, 277 S.W.3d 173 (2008).

We conclude that the procedure implemented by the trial court—holding a separate bench trial on the parties' declaratory-judgment claims and then (if necessary in the event Jones prevailed) holding a jury trial on Jones's breach-of-contract claim—was not improper and was not a deprivation of Jones's right to a jury trial. The Arkansas Supreme Court has explained that declaratory judgment was unknown in the common law; it first became available in Arkansas by Act 274 of 1953, which conferred authority on the courts to hear declaratory-relief actions. *Martin v. Equitable Life Assur. Soc. of the U.S.*, 344 Ark. 177, 40 S.W.3d 733 (2001). Both declaratory judgments and injunctions have long been recognized as matters of equity. *Baptist*

13

*Health v. Murphy*, 2010 Ark. 358, 373 S.W.3d 269 (holding that the trial court properly heard matters of declaratory judgment and injunctive relief).

Although Jones relies on Arkansas Code Annotated section 16-111-109 as guaranteeing his right to a jury trial, under that section, a party has a right to a jury trial on a request for a declaratory-judgment claim only when it "involves the determination of an issue of fact." This was illustrated in *Arkansas Voter Integrity Initiative, Inc. v. Thurston*, 2024 Ark. 43, 686 S.W.3d 477.

In *Thurston*, a corporation and an individual brought an action against the Arkansas Secretary of State, the Arkansas State Board of Election Commissioners, and an election-software company for (1) a declaration that voting machines failed to comply with a state statute governing voting-machine specifications, (2) violation of the Arkansas Deceptive Trade Practices Act, (3) fraud, (4) illegal exaction, and (5) injunctive relief. After a bench trial, the trial court ruled against the plaintiffs, and on appeal, the supreme court rejected the plaintiffs' argument that they were constitutionally entitled to a jury trial on their claims. The supreme court in *Thurston* noted that Arkansas Code Annotated section 16-111-109 does not confer the right to a jury trial unless there are issues of fact. The supreme court explained:

> The circuit court's interpretation and application of Ark. Code Ann. § 7-5-504 to these undisputed facts was a question of law, not one of fact, and appellants were therefore not entitled to a jury trial on this issue. Because the circuit court concluded that appellants failed on their declaratory-judgment claim, their remaining causes of action also failed. Thus, appellants were not deprived of their right to a jury trial, and the circuit court did not err by denying their motion for new trial.

*Thurston*, 2024 Ark. 43, at 15, 686 S.W.3d at 486 (citations omitted).

We hold that, as in *Thurston*, the declaratory action herein did not involve the determination of an issue of fact as further discussed below in point three; therefore, Jones was not entitled to a jury trial under Arkansas Code Annotated section 16-111-109. The construction and legal effect of contracts are to be determined by the court as a matter of law, except in instances in which the meaning of language depends on disputed extrinsic evidence. *Kremer v. Blissard Mgmt. & Realty, Inc.*, 289 Ark. 419, 711 S.W.2d 813 (1986). Here, because the contract was unambiguous, the validity and meaning of the parties' contract were matters of law to be decided by the court and did not require factual determinations. As the trial court found below, Jones's breach-of-contract claim was "parasitic of the declaratory judgment," and a jury trial on Jones's breach-of-contract claim was necessary only if Jones prevailed on the competing declaratory-judgment claims. Because Jones did not prevail in the declaratory-judgment action, his remaining cause of action for breach of contract also failed, and he was not deprived of his right to a jury trial.

B.  The Trial Court Erred in Finding that There was Consideration Provided by MNLRN to Support the Formation of a Contract

Jones next argues that the trial court erred in finding that there was consideration provided by MNLRN to support the formation of a contract because, in the Sublease Assignment, Jones received nothing in exchange for relinquishing his option to extend the lease for the final five-year period through October 2026. Jones asserts that in both the Prime Lease and the Sublease, he was given the right to exercise both five-year lease extensions and that he received nothing in the Sublease Assignment to which he was not already entitled under the

15

prior contracts. Arguing that there was no *new consideration* to support the relinquishment of this right in the Sublease Agreement, Jones contends that the Sublease Assignment was invalid.

For there to be a binding contract, there must be legal consideration. *Moss v. Allstate Ins. Co.*, 29 Ark. App. 33, 776 S.W.2d 831 (1989). Consideration is any benefit conferred or agreed to be conferred upon the promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suffered by the promisor, other than such as he is lawfully bound to suffer. *Youree v. Eshaghoff*, 99 Ark. App. 4, 256 S.W.3d 551 (2007).

Under Arkansas law, there must be additional consideration when the parties to a contract enter into an additional contract. *Crookham & Vessels, Inc. v. Larry Moyer Trucking, Inc.*, 16 Ark. App. 214, 699 S.W.2d 414 (1985). Although mutual promises may be adequate consideration to uphold a contract, the promise must have value to the party agreeing to the change; if no benefit is received by the obligee except what he was entitled to under the original contract, and the other party to the contract parts with nothing except what he was already bound for, there is no consideration for the additional contract. *Youree, supra.*

In appeals from bench trials, we will reverse only if the trial court's findings are clearly erroneous. *Glenn v. Bubbus*, 2018 Ark. App. 252, 548 S.W.3d 857. The trial court found that MNLRN's guaranteed exercise of the first five-year lease extension, including all the obligations thereto, including payment of rent and the expenses relating to maintaining the Property, constituted consideration to support the Sublease Agreement, and we hold that this finding was not clearly erroneous. Before negotiating and executing the Sublease Assignment, MNLRN was not a party to any contract among the parties and was therefore not lawfully bound under any

prior agreement. Therefore, by agreeing to be bound by the first five-year lease extension, MNLRN accepted an obligation that was new to MNLRN and it did not "part with nothing except what [it] was already bound for" under the analysis explained in *Youree*, *supra*. Therefore, we hold that the trial court committed no error in finding that there was sufficient consideration to support the validity of the Sublease Agreement.

## C. The Trial Court Erred in Finding that the Contract Was Not Ambiguous and in Failing to Construe the Ambiguities Against MNLRN

Jones next argues that the trial court erred in not finding the parties' contract ambiguous and argues further that the ambiguities should have been construed against MNLRN.[9] The trial court found that the Sublease Agreement was unambiguous by its plain terms as expressed in paragraph 2 of the agreement, which gave MNLRN the sole right to exercise the second five-year lease extension beyond October 2021. Paragraph 2 of the Sublease Agreement provides in pertinent part:

> In connection with this Agreement, the parties acknowledge and agree that the first five (5) year renewal term is hereby exercised such that the Sublease Term shall expire on October 8, 2021, unless otherwise renewed or sooner terminated in accordance with the term of the Lease or Sublease. In addition, the parties intend to grant the right with respect to the exercise of any renewal option left with respect to the Lease or the Sublease *solely to Assignee* (MNLRN), which, if and to the extent necessary, is hereby acknowledged as a modification and amendment under the Lease and the Sublease that is agreed to by the Landlords and the Sublessor.

---

[9]Under this point, Jones observes that in the trial court's order denying the parties' cross-motions for summary judgment, the trial court had found that the relevant documents were ambiguous. However, the denial of a summary-judgment motion is not an appealable order and is not subject to review on appeal, even after a trial on the merits. *Rick's Pro Dive 'N Ski Shop v. Jennings*, 304 Ark. 671, 803 S.W.2d 934 (1991). We review the final judgment, which is tested upon the record as it existed at the time it is rendered. *See id.*

17

(Emphasis added.)  Notwithstanding paragraph 2's clear directive in this regard, Jones suggests that the following language in paragraph 5 of the Sublease Agreement creates ambiguity:

> The Landlords and the Sublessor each further confirm and agree the Sublease in is full force and effect and has not been modified, supplemented or amended in any way and the Lease and the Sublease represent the entire agreement between the parties[.]

When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the written agreement according to the plain meaning of the language employed.  *Hobson v. Hobson*, 2025 Ark. App. 311, 715 S.W.3d 890.  Whether an ambiguity exists is a matter for the trial court to decide.  *B.G. Coney Co. v. Radford Petroleum Equip. Co.*, 287 Ark. 108, 696 S.W.2d 745 (1985).  We have defined ambiguous as (1) doubtful or uncertain or (2) capable of being understood in two or more possible senses. *Am. Pioneer Life Ins. Co. v. Allender*, 18 Ark. App. 234, 713 S.W.2d 249 (1986).  When a contract is unambiguous, its construction is a question of law for the court.  *Hobson*, *supra*.

We hold that the trial court committed no error in finding that the Sublease Agreement unambiguously and plainly granted the sole right to exercise the final five-year lease extension to MNLRN by the clear terms of paragraph 2 of the agreement.  Although paragraph 5 contains confirmation between the Property owners and Jones that there has been no modification of the prior agreements as between those parties, this paragraph contains no such assent by MNLRN, and to hold otherwise would be to render the unmistakable provisions in paragraph 2 meaningless.  As found by the trial court, Jones and MNLRN negotiated and agreed to MNLRN's option to exercise the final five-year extension as reflected in the contract; therefore, the trial court properly entered a declaratory judgment in favor of MNLRN in this regard.

18

Finally under this point, Jones asserts that we should consider the Estoppel Certificate that he alone executed, which he claims creates an ambiguity as to which party may exercise the final five-year lease renewal option. However, that document is undated, and the trial court found that it was not executed contemporaneously with the Sublease Assignment. The trial court also found that even if that document is considered, the result is the same because it contains a similar provision granting MNLRN the option of exercising the final five-year lease extension, and we agree. Therefore, in our review of this point, we hold that none of the trial court's findings were erroneous.

### D.  If the Underlying Judgment Is Reversed, the Attorney's Fees Should Also Be Reversed

Jones's remaining argument is that, if we reverse the underlying declaratory judgment, MNLRN would no longer be the prevailing party, and the award of attorney's fees should be reversed. Because we affirm the declaratory judgment, we also affirm the order awarding attorney's fees.

### III.  *Conclusion*

Having reviewed the record and Jones's points on appeal, we conclude that none of the points have presented grounds for reversal. Accordingly, the declaratory judgment and the order awarding attorney's fees are affirmed.

Affirmed.

GLADWIN and MURPHY, JJ., agree.

*Timothy O. Dudley*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *Bruce B. Tidwell* and *Kathy McCarroll*, for appellee.